## NATIONAL CREDIT UNION ADMINISTRATION *v.* FIRST NATIONAL BANK & TRUST CO. ET AL.

No. 96–843.   Argued October 6, 1997—Decided February 25, 1998*

*Together with No. 96–847, *AT&T Family Federal Credit Union et al.* v. *First National Bank & Trust Co. et al.*, also on certiorari to the same court.

THOMAS, J., delivered an opinion, which was for the Court except as to footnote 6. REHNQUIST, C. J., and KENNEDY and GINSBURG, JJ., joined that opinion in full, and SCALIA, J., joined except as to footnote 6. O'CONNOR, J., filed a dissenting opinion, in which STEVENS, SOUTER, and BREYER, JJ., joined, *post*, p. 503.

*Solicitor General Waxman* argued the cause for the federal petitioner. With him on the briefs were *Acting Solicitor General Dellinger, Assistant Attorney General Hunger, David C. Frederick, Douglas N. Letter, Jacob M. Lewis, Michael E. Robinson,* and *John K. Ianno. John G. Roberts, Jr.,* argued the cause for petitioner AT&T Family Federal Credit Union et al. With him on the briefs were *Paul J. Lambert, Jonathan S. Franklin,* and *Brenda S. Furlow.*

*Michael S. Helfer* argued the cause for respondents. With him on the briefs were *Louis R. Cohen, Christopher R. Lipsett, John J. Gill III,* and *Michael F. Crotty.*†

JUSTICE THOMAS delivered the opinion of the Court, except as to footnote 6.*

Section 109 of the Federal Credit Union Act (FCUA), 48 Stat. 1219, 12 U. S. C. § 1759, provides that "[f]ederal credit union membership shall be limited to groups having a common bond of occupation or association, or to groups within

---

†Briefs of *amici curiae* urging reversal were filed for the Ad Hoc Small Employers Group et al. by *Paul G. Gaston, Richard J. Dines,* and *Christiane Gigi Hyland;* for the California Credit Union League by *Thomas H. Ott, Craig A. Horowitz, Wayne D. Clayton,* and *Joseph A. McDonald;* for the Consumer Federation of America, Inc., et al. by *Joseph C. Zengerle;* for the National Association of Federal Credit Unions by *John F. Cooney, Ronald R. Glancz, Melissa Landau Steinman, William J. Donovan,* and *Fred M. Haden;* and for the National Association of State Credit Union Supervisors by *Stanley M. Gorinson, John Longstreth,* and *C. Stephen Trimmier.*

*Leonard J. Rubin* filed a brief for the Independent Bankers Association of America et al. as *amici curiae* urging affirmance.

*JUSTICE SCALIA joins this opinion, except as to footnote 6.

a well-defined neighborhood, community, or rural district." Since 1982, the National Credit Union Administration (NCUA), the agency charged with administering the FCUA, has interpreted § 109 to permit federal credit unions to be composed of multiple unrelated employer groups, each having its own common bond of occupation. In this action, respondents, five banks and the American Bankers Association, have challenged this interpretation on the ground that § 109 unambiguously requires that the *same* common bond of occupation unite every member of an occupationally defined federal credit union. We granted certiorari to answer two questions. First, do respondents have standing under the Administrative Procedure Act to seek federal-court review of the NCUA's interpretation? Second, under the analysis set forth in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), is the NCUA's interpretation permissible? We answer the first question in the affirmative and the second question in the negative. We therefore affirm.

## I

### A

In 1934, during the Great Depression, Congress enacted the FCUA, which authorizes the chartering of credit unions at the national level and provides that federal credit unions may, as a general matter, offer banking services only to their members. Section 109 of the FCUA, which has remained virtually unaltered since the FCUA's enactment, expressly restricts membership in federal credit unions. In relevant part, it provides:

> "Federal credit union membership shall consist of the incorporators and such other persons and incorporated and unincorporated organizations, to the extent permitted by rules and regulations prescribed by the Board, as may be elected to membership and as such shall each, subscribe to at least one share of its stock and pay the

initial installment thereon and a uniform entrance fee if required by the board of directors; *except that Federal credit union membership shall be limited to groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district."* 12 U. S. C. § 1759 (emphasis added).

Until 1982, the NCUA and its predecessors consistently interpreted § 109 to require that the *same* common bond of occupation unite every member of an occupationally defined federal credit union. In 1982, however, the NCUA reversed its longstanding policy in order to permit credit unions to be composed of multiple unrelated employer groups. See IRPS 82–1, 47 Fed. Reg. 16775 (1982). It thus interpreted § 109's common bond requirement to apply only to each employer group in a multiple-group credit union, rather than to every member of that credit union. See IRPS 82–3, 47 Fed. Reg. 26808 (1982). Under the NCUA's new interpretation, all of the employer groups in a multiple-group credit union had to be located "within a well-defined area," *ibid.*, but the NCUA later revised this requirement to provide that each employer group could be located within "an area surrounding the [credit union's] home or a branch office that can be reasonably served by the [credit union] as determined by NCUA." IRPS 89–1, 54 Fed. Reg. 31170 (1989). Since 1982, therefore, the NCUA has permitted federal credit unions to be composed of wholly unrelated employer groups, each having its own distinct common bond.

## B

After the NCUA revised its interpretation of § 109, petitioner AT&T Family Federal Credit Union (ATTF) expanded its operations considerably by adding unrelated employer groups to its membership. As a result, ATTF now has approximately 110,000 members nationwide, only 35% of

whom are employees of AT&T and its affiliates. See Brief for Petitioner NCUA 9. The remaining members are employees of such diverse companies as the Lee Apparel Company, the Coca-Cola Bottling Company, the Ciba-Geigy Corporation, the Duke Power Company, and the American Tobacco Company. See App. 54–79.

In 1990, after the NCUA approved a series of amendments to ATTF's charter that added several such unrelated employer groups to ATTF's membership, respondents brought this action. Invoking the judicial review provisions of the Administrative Procedure Act (APA), 5 U. S. C. § 702, respondents claimed that the NCUA's approval of the charter amendments was contrary to law because the members of the new groups did not share a common bond of occupation with ATTF's existing members, as respondents alleged § 109 required. ATTF and petitioner Credit Union National Association were permitted to intervene in the action as defendants.

The District Court dismissed the complaint. It held that respondents lacked prudential standing to challenge the NCUA's chartering decision because their interests were not within the "zone of interests" to be protected by § 109, as required by this Court's cases interpreting the APA. *First Nat. Bank & Trust Co.* v. *National Credit Union Admin.*, 772 F. Supp. 609 (DC 1991). The District Court rejected as irrelevant respondents' claims that the NCUA's interpretation had caused them competitive injury, stating that the legislative history of the FCUA demonstrated that it was passed "to establish a place for credit unions within the country's financial market, and specifically not to protect the competitive interest of banks." *Id.*, at 612. The District Court also determined that respondents were not "suitable challengers" to the NCUA's interpretation, as that term had been used in prior prudential standing cases from the Court of Appeals for the District of Columbia Circuit. *Ibid.*

The Court of Appeals for the District of Columbia Circuit reversed. *First Nat. Bank & Trust Co.* v. *National Credit Union Admin.*, 988 F. 2d 1272, cert. denied, 510 U. S. 907 (1993). The Court of Appeals agreed that "Congress did not, in 1934, intend to shield banks from competition from credit unions," 988 F. 2d, at 1275, and hence respondents could not be said to be "intended beneficiaries" of § 109. Relying on two of our prudential standing cases involving the financial services industry, *Investment Company Institute* v. *Camp*, 401 U. S. 617 (1971), and *Clarke* v. *Securities Industry Assn.*, 479 U. S. 388 (1987), the Court of Appeals nonetheless concluded that respondents' interests were sufficiently congruent with the interests of § 109's intended beneficiaries that respondents were "suitable challengers" to the NCUA's chartering decision; therefore, their suit could proceed. See 988 F. 2d, at 1276–1278.[1]

On remand, the District Court applied the two-step analysis that we announced in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), and held that the NCUA had permissibly interpreted § 109. 863 F. Supp. 9 (DC 1994). It first asked whether, in enacting § 109, Congress had spoken directly to the precise question at issue—whether the same common bond of occupation must unite members of a federal credit union composed of multiple employer groups. See *id.,* at 12. It determined that because § 109 could plausibly be understood to permit an occupationally defined federal credit union to consist of several employer "groups," each having its own distinct common bond of occupation, Congress had not unambiguously addressed this question. See *ibid.* The District Court then

---

[1] The Court of Appeals' holding that respondents had prudential standing conflicted with a decision of the United States Court of Appeals for the Fourth Circuit reached prior to this Court's decision in *Clarke* v. *Securities Industry Assn.*, 479 U. S. 388 (1987). See *Branch Bank & Trust Co.* v. *National Credit Union Administration Bd.*, 786 F. 2d 621 (1986), cert. denied, 479 U. S. 1063 (1987).

stated that it was unnecessary to decide, under the second step of *Chevron*, whether the NCUA's interpretation was reasonable, because respondents had not "seriously argued" that the interpretation was unreasonable. See 863 F. Supp., at 13–14. Accordingly, the District Court entered summary judgment against respondents. See *ibid.*

The Court of Appeals again reversed. 90 F. 3d 525 (CADC 1996). It held that the District Court had incorrectly applied the first step of *Chevron:* Congress had indeed spoken directly to the precise question at issue and had unambiguously indicated that the same common bond of occupation must unite members of a federal credit union composed of multiple employer groups. See 90 F. 3d, at 527. The Court of Appeals reasoned that because the concept of a "common bond" is implicit in the term "group," the term "common bond" would be surplusage if it applied only to the members of each constituent "group" in a multiple-group federal credit union. See *id.*, at 528. It further noted that the NCUA had not interpreted § 109's geographical limitation to allow federal credit unions to comprise groups from multiple unrelated "neighborhood[s], communit[ies], or rural district[s]" and stated that the occupational limitation should not be interpreted differently. See *id.*, at 528–529. The NCUA's revised interpretation of § 109 was therefore impermissible.[2] See *id.*, at 529. Because of the importance of the issues presented,[3] we granted certiorari. 519 U. S. 1148 (1997).

---

[2] A panel of the Court of Appeals for the Sixth Circuit later reached a similar conclusion, with one judge dissenting. See *First City Bank* v. *National Credit Union Administration Bd.*, 111 F. 3d 433 (1997).

[3] According to the NCUA, since 1982, thousands of federal credit unions have relied on the NCUA's revised interpretation of § 109. See Pet. for Cert. in No. 96–843, p. 14. Moreover, following the Court of Appeals' decision on the merits, the United States District Court for the District of Columbia granted a nationwide injunction prohibiting the NCUA from approving the addition of unrelated employer groups to *any* federal credit union. See Brief for Petitioner ATTF 14, n. 5.

## II

Respondents claim a right to judicial review of the NCUA's chartering decision under § 10(a) of the APA, which provides:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U. S. C. § 702.

We have interpreted § 10(a) of the APA to impose a prudential standing requirement in addition to the requirement, imposed by Article III of the Constitution, that a plaintiff have suffered a sufficient injury in fact. See, *e. g., Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U. S. 150, 152 (1970) *(Data Processing)*.[4] For a plaintiff to have prudential standing under the APA, "the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Id.*, at 153.

Based on four of our prior cases finding that competitors of financial institutions have standing to challenge agency action relaxing statutory restrictions on the activities of those institutions, we hold that respondents' interest in limiting the markets that federal credit unions can serve is arguably within the zone of interests to be protected by § 109. Therefore, respondents have prudential standing under the APA to challenge the NCUA's interpretation.

### A

Although our prior cases have not stated a clear rule for determining when a plaintiff's interest is "arguably within the zone of interests" to be protected by a statute, they none-

---

[4] In this action, it is not disputed that respondents have suffered an injury in fact because the NCUA's interpretation allows persons who might otherwise be their customers to be members, and therefore customers, of ATTF.

theless establish that we should not inquire whether there has been a congressional intent to benefit the would-be plaintiff. In *Data Processing, supra,* the Office of the Comptroller of the Currency (Comptroller) had interpreted the National Bank Act's incidental powers clause, Rev. Stat. § 5136, 12 U. S. C. § 24 Seventh, to permit national banks to perform data processing services for other banks and bank customers. See *Data Processing, supra,* at 151. The plaintiffs, a data processing corporation and its trade association, alleged that this interpretation was impermissible because providing data processing services was not, as was required by the statute, "[an] incidental powe[r] . . . necessary to carry on the business of banking." See 397 U. S., at 157, n. 2.

In holding that the plaintiffs had standing, we stated that § 10(a) of the APA required only that "the interest sought to be protected by the complainant [be] arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Id.,* at 153. In determining that the plaintiffs' interest met this requirement, we noted that although the relevant federal statutes—the National Bank Act, 12 U. S. C. § 24 Seventh, and the Bank Service Corporation Act, 76 Stat. 1132, 12 U. S. C. § 1864—did not "in terms protect a specified group[,] . . . their general policy is apparent; and those whose interests are directly affected by a broad or narrow interpretation of the Acts are easily identifiable." *Data Processing,* 397 U. S., at 157. "[A]s competitors of national banks which are engaging in data processing services," the plaintiffs were within that class of "aggrieved persons" entitled to judicial review of the Comptroller's interpretation. *Ibid.*

Less than a year later, we applied the "zone of interests" test in *Arnold Tours, Inc.* v. *Camp,* 400 U. S. 45 (1970) *(per curiam) (Arnold Tours).* There, certain travel agencies challenged a ruling by the Comptroller, similar to the one contested in *Data Processing,* that permitted national banks to operate travel agencies. See 400 U. S., at 45. In holding

that the plaintiffs had prudential standing under the APA, we noted that it was incorrect to view our decision in *Data Processing* as resting on the peculiar legislative history of § 4 of the Bank Service Corporation Act, which had been passed in part at the behest of the data processing industry. See 400 U. S., at 46. We stated explicitly that "we did not rely on any legislative history showing that Congress desired to protect data processors alone from competition." *Ibid.* We further explained:

> "In *Data Processing* . . . [w]e held that § 4 arguably brings a competitor within the zone of interests protected by it. Nothing in the opinion limited § 4 to protecting only competitors in the data-processing field. When national banks begin to provide travel services for their customers, they compete with travel agents no less than they compete with data processors when they provide data-processing services to their customers." *Ibid.* (internal citations and quotation marks omitted).

A year later, we decided *Investment Company Institute v. Camp,* 401 U. S. 617 (1971) *(ICI)*. In that case, an investment company trade association and several individual investment companies alleged that the Comptroller had violated, *inter alia*, § 21 of the Glass-Steagall Act, 1932,[5] by permitting national banks to establish and operate what in essence were early versions of mutual funds. We held that the plaintiffs, who alleged that they would be injured by the competition resulting from the Comptroller's action, had standing under the APA and stated that the case was controlled by *Data Processing.* See 401 U. S., at 621.

---

[5] Under § 21 of the Glass-Steagall Act, it is unlawful "[f]or any person, firm, [or] corporation . . . engaged in the business of issuing . . . securities, to engage at the same time to any extent whatever in the business of receiving deposits." § 21 of the Banking Act of 1933, 48 Stat. 189, 12 U. S. C. § 378(a).

Significantly, we found unpersuasive Justice Harlan's argument in dissent that the suit should be dismissed because "neither the language of the pertinent provisions of the Glass-Steagall Act nor the legislative history evince[d] any congressional concern for the interests of petitioners and others like them in freedom from competition." *Id.*, at 640.

Our fourth case in this vein was *Clarke* v. *Securities Industry Assn.*, 479 U. S. 388 (1987) *(Clarke)*. There, a securities dealers trade association sued the Comptroller, this time for authorizing two national banks to offer discount brokerage services both at their branch offices and at other locations inside and outside their home States. See *id.*, at 391. The plaintiff contended that the Comptroller's action violated the McFadden Act, which permits national banks to carry on the business of banking only at authorized branches, and to open new branches only in their home States and only to the extent that state-chartered banks in that State can do so under state law. See *id.*, at 391–392.

We again held that the plaintiff had standing under the APA. Summarizing our prior holdings, we stated that although the "zone of interests" test "denies a right of review if the plaintiff's interests are . . . marginally related to or inconsistent with the purposes implicit in the statute," *id.*, at 399, "there need be no indication of congressional purpose to benefit the would-be plaintiff," *id.*, at 399–400 (citing *ICI*). We then determined that by limiting the ability of national banks to do business outside their home States, "Congress ha[d] shown a concern to keep national banks from gaining a monopoly control over credit and money." 479 U. S., at 403. The interest of the securities dealers in preventing national banks from expanding into the securities markets directly implicated this concern because offering discount brokerage services would allow national banks "access to more money, in the form of credit balances, and enhanced opportunities to lend money, viz., for margin purchases." *Ibid.* The case was thus analogous to *Data Processing* and *ICI:* "In those

cases the question was what activities banks could engage in at all; here, the question is what activities banks can engage in without regard to the limitations imposed by state branching law." 479 U. S., at 403.

## B

Our prior cases, therefore, have consistently held that for a plaintiff's interests to be arguably within the "zone of interests" to be protected by a statute, there does not have to be an "indication of congressional purpose to benefit the would-be plaintiff." *Id.*, at 399–400 (citing *ICI*); see also *Arnold Tours*, 400 U. S., at 46 (citing *Data Processing*). The proper inquiry is simply "whether the interest sought to be protected by the complainant is *arguably* within the zone of interests to be protected . . . by the statute." *Data Processing*, 397 U. S., at 153 (emphasis added). Hence in applying the "zone of interests" test, we do not ask whether, in enacting the statutory provision at issue, Congress specifically intended to benefit the plaintiff. Instead, we first discern the interests "arguably . . . to be protected" by the statutory provision at issue; we then inquire whether the plaintiff's interests affected by the agency action in question are among them.

Section 109 provides that "[f]ederal credit union membership shall be limited to groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district." 12 U. S. C. § 1759. By its express terms, § 109 limits membership in every federal credit union to members of definable "groups." Because federal credit unions may, as a general matter, offer banking services only to members, see, *e. g.*, 12 U. S. C. §§ 1757(5)–(6), § 109 also restricts the markets that every federal credit union can serve. Although these markets need not be small, they unquestionably are limited. The link between § 109's regulation of federal credit union membership and its limitation on the markets that federal credit unions can serve is unmistakable. Thus, even if it cannot be said

that Congress had the specific purpose of benefiting commercial banks, one of the interests "arguably . . . to be protected" by § 109 is an interest in limiting the markets that federal credit unions can serve.[6]   This interest is precisely the interest of respondents affected by the NCUA's interpretation of § 109.   As competitors of federal credit unions, respondents certainly have an interest in limiting the markets that federal credit unions can serve, and the NCUA's interpretation

---

[6] The legislative history of § 109, upon which petitioners so heavily rely, supports this conclusion.   Credit unions originated in mid-19th-century Europe as cooperative associations that were intended to provide credit to persons of small means; they were usually organized around some common theme, either geographic or associational.   See General Accounting Office, Credit Unions: Reforms for Ensuring Future Soundness 24 (July 1991). Following the European example, in the 1920's many States passed statutes authorizing the chartering of credit unions, and a number of those statutes contained provisions similar to § 109's common bond requirement. See A. Burger & T. Dacin, Field of Membership: An Evolving Concept 6 (2d ed. 1992).

During the Great Depression, in contrast to widespread bank failures at both the state and national level, there were no involuntary liquidations of state-chartered credit unions.   See S. Rep. No. 555, 73d Cong., 2d Sess., 2 (1934).   The cooperative nature of the institutions, which state-law common bond provisions reinforced, was believed to have contributed to this result.   See Credit Unions: Hearing before a Subcommittee of the Senate Committee on Banking and Currency, 73d Cong., 1st Sess., 19–20, 26 (1933).   A common bond provision was thus included in the District of Columbia Credit Union Act, which Congress passed in 1932; it was identical to the FCUA's common bond provision enacted two years later.   When Congress enacted the FCUA, sponsors of the legislation emphasized that the cooperative nature of credit unions allowed them to make credit available to persons who otherwise would not qualify for loans.   See S. Rep. No. 555, *supra*, at 1, 3.

The legislative history thus confirms that § 109 was thought to reinforce the cooperative nature of credit unions, which in turn was believed to promote their safety and soundness and allow access to credit to persons otherwise unable to borrow.   Because, by its very nature, a cooperative institution must serve a limited market, the legislative history of § 109 demonstrates that one of the interests "arguably . . . to be protected" · by § 109 is an interest in limiting the markets that federal credit unions can serve.

has affected that interest by allowing federal credit unions to increase their customer base.[7]

Section 109 cannot be distinguished from the statutory provisions at issue in *Clarke, ICI, Arnold Tours,* and *Data Processing.* Although in *Clarke* the McFadden Act appeared to be designed to protect only the interest of state banks in parity of treatment with national banks, we nonetheless determined that the statute also limited "the extent to which [national] banks [could] engage in the discount brokerage business and hence limit[ed] the competitive impact on nonbank discount brokerage houses." *Clarke,* 479 U. S., at 403. Accordingly, although Congress did not intend specifically to protect securities dealers, one of the interests "arguably . . . to be protected" by the statute was an interest in restricting national bank market power. The plaintiff securities dealers, as competitors of national banks, had that interest, and that interest had been affected by the inter-

---

[7] Contrary to the dissent's contentions, see *post,* at 503, 509, our formulation does not "eviscerat[e]" or "abolis[h]" the zone of interests requirement. Nor can it be read to imply that, in order to have standing under the APA, a plaintiff must merely have an interest in enforcing the statute in question. The test we have articulated—discerning the interests "arguably . . . to be protected" by the statutory provision at issue and inquiring whether the plaintiff's interests affected by the agency action in question are among them—differs only as a matter of semantics from the formulation that the dissent has accused us of "eviscerating" or "abolishing," see *post,* at 504 (stating that the plaintiff must establish that "the injury he complains of . . . falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint" (internal quotation marks and citation omitted)).

Our only disagreement with the dissent lies in the application of the "zone of interests" test. Because of the unmistakable link between § 109's express restriction on credit union membership and the limitation on the markets that federal credit unions can serve, there is objectively "some indication in the statute," *post,* at 517 (emphasis deleted), that respondents' interest is "arguably within the zone of interests to be protected" by § 109. Hence respondents are more than merely incidental beneficiaries of § 109's effects on competition.

pretation of the McFadden Act they sought to challenge, because that interpretation had allowed national banks to expand their activities and serve new customers. See *ibid.*

Similarly, in *ICI*, even though in enacting the Glass-Steagall Act, Congress did not intend specifically to benefit investment companies and may have sought only to protect national banks and their depositors, one of the interests "arguably . . . to be protected" by the statute was an interest in restricting the ability of national banks to enter the securities business. The investment company plaintiffs, as competitors of national banks, had that interest, and that interest had been affected by the Comptroller's interpretation allowing national banks to establish mutual funds.

So too, in *Arnold Tours* and *Data Processing*, although in enacting the National Bank Act and the Bank Service Corporation Act, Congress did not intend specifically to benefit travel agents and data processors and may have been concerned only with the safety and soundness of national banks, one of the interests "arguably . . . to be protected" by the statutes was an interest in preventing national banks from entering other businesses' product markets. As competitors of national banks, travel agents and data processors had that interest, and that interest had been affected by the Comptroller's interpretations opening their markets to national banks. See also *NationsBank of N. C., N. A.* v. *Variable Annuity Life Ins. Co.*, 513 U. S. 251 (1995) (deciding that the Comptroller had permissibly interpreted 12 U. S. C. §24 Seventh to allow national banks to act as agents in the sale of annuities; insurance agents' standing to challenge the interpretation not questioned).

C

Petitioners attempt to distinguish this action principally on the ground that there is no evidence that Congress, when

it enacted the FCUA, was at all concerned with the competitive interests of commercial banks, or indeed at all concerned with competition. See Brief for Petitioner ATTF 21–22. Indeed, petitioners contend that the very reason Congress passed the FCUA was that "[b]anks were simply not in the picture" as far as small borrowers were concerned, and thus Congress believed it necessary to create a new source of credit for people of modest means. See *id.*, at 25.

The difficulty with this argument is that similar arguments were made unsuccessfully in each of *Data Processing, Arnold Tours, ICI,* and *Clarke.* In *Data Processing,* the Comptroller argued against standing for the following reasons:

> "[P]etitioners do not contend that Section 24 Seventh had any purpose . . . to protect the interest of potential competitors of national banks. The reason is clear: the legislative history of the Section dispels all possible doubt that its enactment in 1864 (13 Stat. 101) was for the express and sole purpose of creating a strong national banking system . . . . To the extent that the protection of a competitive interest was at the bottom of the enactment of Section 24 Seventh, it was the interest of national banks and not of their competitors." Brief for Comptroller of the Currency in *Association of Data Processing Service Organizations, Inc.* v. *Camp,* O. T. 1969, No. 85, pp. 19–20.

Similarly, in *Arnold Tours,* the Comptroller contended that the position of the travel agents was "markedly different from that of the data processors," who could find in the legislative history "some manifestation of legislative concern for their competitive position." Memorandum for Comptroller of the Currency in Opposition in *Arnold Tours, Inc.* v. *Camp,* O. T. 1970, No. 602, pp. 3–4. And in *ICI,* the Comptroller again urged us not to find standing, because—

"[t]he thrust of the legislation, and the concern of the drafters, was to protect the banking public through the maintenance of a sound national banking system . . . .

. . . . .

"There was no Congressional objective to protect mutual funds or their investment advisers or underwriters." Brief for Comptroller of Currency in *Investment Company Institute* v. *Camp*, O. T. 1970, No. 61, pp. 27–29 (internal quotation marks omitted).

"Indeed, the Congressional attitude toward the investment bankers can only be characterized as one of distaste. For example, in discussing the private investment bankers, Senator Glass pointed out that many of them had 'unloaded millions of dollars of worthless investment securities upon the banks of this country.'" *Id.*, at 30, n. 22 (citation omitted).

Finally, in *Clarke*, the Comptroller contended that "[t]here is no doubt that Congress had only one type of competitive injury in mind when it passed the [McFadden] Act—the type that national and state banks might inflict upon each other." Brief for Federal Petitioner in *Clarke* v. *Securities Industry Assn.*, O. T. 1985, No. 85–971, p. 24.

In each case, we declined to accept the Comptroller's argument. In *Data Processing*, we considered it irrelevant that the statutes in question "d[id] not in terms protect a specified group," because "their general policy [was] apparent[,] and those whose interests [were] directly affected by a broad or narrow interpretation of [the statutes] [were] easily identifiable." 397 U. S., at 157. In *Arnold Tours*, we similarly believed it irrelevant that Congress had shown no concern for the competitive position of travel agents in enacting the statutes in question. See 400 U. S., at 46. In *ICI*, we were unmoved by Justice Harlan's comment in dissent that the Glass-Steagall Act was passed *in spite of* its positive effects on the competitive position of investment banks. See 401 U. S., at 640. And in *Clarke*, we did not debate whether

the Congress that enacted the McFadden Act was concerned about the competitive position of securities dealers. See 479 U. S., at 403. The provisions at issue in each of these cases, moreover, could be said merely to be safety-and-soundness provisions, enacted only to protect national banks and their depositors and without a concern for competitive effects. We nonetheless did not hesitate to find standing.

We therefore cannot accept petitioners' argument that respondents do not have standing because there is no evidence that the Congress that enacted § 109 was concerned with the competitive interests of commercial banks. To accept that argument, we would have to reformulate the "zone of interests" test to require that Congress have specifically intended to benefit a particular class of plaintiffs before a plaintiff from that class could have standing under the APA to sue. We have refused to do this in our prior cases, and we refuse to do so today.

Petitioners also mistakenly rely on our decision in *Air Courier Conference* v. *Postal Workers*, 498 U. S. 517 (1991). In *Air Courier*, we held that the interest of Postal Service employees in maximizing employment opportunities was not within the "zone of interests" to be protected by the postal monopoly statutes, and hence those employees did not have standing under the APA to challenge a Postal Service regulation suspending its monopoly over certain international operations. See *id.*, at 519. We stated that the purposes of the statute were solely to increase the revenues of the Post Office and to ensure that postal services were provided in a manner consistent with the public interest, see *id.*, at 526–527. Only those interests, therefore, and not the interests of Postal Service employees in their employment, were "arguably within the zone of interests to be protected" by the statute. Cf. *Lujan* v. *National Wildlife Federation*, 497 U. S. 871, 883 (1990) (stating that an agency reporting company would not have prudential standing to challenge the agency's failure to comply with a statutory mandate to con-

duct hearings on the record). We further noted that although the statute in question regulated competition, the interests of the plaintiff employees had nothing to do with competition. See *Air Courier, supra,* at 528, n. 5 (stating that "[e]mployees have generally been denied standing to enforce competition laws because they lack competitive and direct injury"). In this action, not only do respondents have "competitive and direct injury," but, as the foregoing discussion makes clear, they possess an interest that is "arguably ... to be protected" by § 109.

Respondents' interest in limiting the markets that credit unions can serve is "arguably within the zone of interests to be protected" by § 109. Under our precedents, it is irrelevant that in enacting the FCUA, Congress did not specifically intend to protect commercial banks. Although it is clear that respondents' objectives in this action are not eleemosynary in nature,[8] under our prior cases that, too, is beside the point.[9]

## III

Turning to the merits, we must judge the permissibility of the NCUA's current interpretation of § 109 by employing the analysis set forth in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984). Under that analysis, we first ask whether Congress has "directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously

---

[8] The data processing companies, travel agents, investment companies, and securities dealers that challenged the Comptroller's rulings in our prior cases certainly did not bring suit to advance the noble goal of maintaining the safety and soundness of national banks, or to promote the interests of national bank depositors.

[9] Unlike some of our prudential standing cases, no suggestion is made in this action that Congress has sought to preclude judicial review of agency action. See, *e. g., Block* v. *Community Nutrition Institute,* 467 U. S. 340 (1984).

expressed intent of Congress." *Id.*, at 842–843. If we determine that Congress has not directly spoken to the precise question at issue, we then inquire whether the agency's interpretation is reasonable. See *id.*, at 843–844. Because we conclude that Congress has made it clear that the *same* common bond of occupation must unite each member of an occupationally defined federal credit union, we hold that the NCUA's contrary interpretation is impermissible under the first step of *Chevron*.

As noted, § 109 requires that "[f]ederal credit union membership shall be limited to groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district." Respondents contend that because § 109 uses the article "a"—"*i. e.*, one"— in conjunction with the noun "common bond," the "natural reading" of § 109 is that all members in an occupationally defined federal credit union must be united by one common bond. See Brief for Respondents 33. Petitioners reply that because § 109 uses the plural noun "groups," it permits multiple groups, each with its own common bond, to constitute a federal credit union. See Brief for Petitioner NCUA 29–30.

Like the Court of Appeals, we do not think that either of these contentions, standing alone, is conclusive. The article "a" could be thought to convey merely that one bond must unite only the members of each group in a multiple-group credit union, and not all of the members in the credit union taken together. See 90 F. 3d, at 528. Similarly, the plural word "groups" could be thought to refer not merely to multiple groups in a particular credit union, but rather to every single "group" that forms a distinct credit union under the FCUA. See *ibid.* Nonetheless, as the Court of Appeals correctly recognized, additional considerations compel the conclusion that the same common bond of occupation must unite all of the members of an occupationally defined federal credit union.

First, the NCUA's current interpretation makes the phrase "common bond" surplusage when applied to a federal credit union made up of multiple unrelated employer groups, because each "group" in such a credit union already has its own "common bond." See *ibid.* To use the facts of this action, the employees of AT&T and the employees of the American Tobacco Company each already had a "common bond" before being joined together as members of ATTF. The former were bonded because they worked for AT&T, and the latter were bonded because they worked for the American Tobacco Company. If the phrase "common bond" is to be given any meaning when these employees are joined together, a different "common bond"—one extending to each and every employee considered together—must be found to unite them. Such a "common bond" exists when employees of different subsidiaries of the same company are joined together in a federal credit union; it does not exist, however, when employees of unrelated companies are so joined. See *ibid.* Put another way, in the multiple employer group context, the NCUA has read the statute as though it merely stated that "[f]ederal credit union membership shall be limited to occupational groups," but that is simply not what the statute provides.

Second, the NCUA's interpretation violates the established canon of construction that similar language contained within the same section of a statute must be accorded a consistent meaning. See *Wisconsin Dept. of Revenue* v. *William Wrigley, Jr., Co.,* 505 U. S. 214, 225 (1992). Section 109 consists of two parallel clauses: Federal credit union membership is limited "to groups having a common bond of occupation or association, *or* to groups within a well-defined neighborhood, community, or rural district." 12 U. S. C. § 1759 (emphasis added). The NCUA concedes that even though the second limitation permits geographically defined credit unions to have as members more than one "group," all of the groups must come from the *same* "neighborhood,

community, or rural district." See Brief for Petitioner NCUA 37. The reason that the NCUA has never interpreted, and does not contend that it *could* interpret, the geographical limitation to allow a credit union to be composed of members from an unlimited number of unrelated geographic units, is that to do so would render the geographical limitation meaningless. Under established principles of statutory interpretation, we must interpret the occupational limitation in the same way.

Petitioners have advanced one reason why we should interpret the occupational limitation differently. They contend that whereas the geographical limitation uses the word "within" and is thus "prepositional," the occupational limitation uses the word "having" and is thus "participial" (and therefore less limiting). See Brief for Petitioner NCUA 31. There is, however, no reason why a participial phrase is inherently more open-ended than a prepositional one; indeed, certain participial phrases can narrow the relevant universe in an exceedingly effective manner—for example, "persons having February 29th as a wedding anniversary." Reading the two parallel clauses in the same way, we must conclude that, just as all members of a geographically defined federal credit union must be drawn from the same "neighborhood, community, or rural district," members of an occupationally defined federal credit union must be united by the same "common bond of occupation."

Finally, by its terms, § 109 requires that membership in federal credit unions "shall be limited." The NCUA's interpretation—under which a common bond of occupation must unite only the members of each unrelated employer group—has the potential to read these words out of the statute entirely. The NCUA has not contested that, under its current interpretation, it would be permissible to grant a charter to a conglomerate credit union whose members would include the employees of every company in the United States. Nor can it: Each company's employees would be a "group," and

each such "group" would have its own "common bond of occupation." Section 109, however, cannot be considered a *limitation* on credit union membership if at the same time it permits such a *limitless* result.

For the foregoing reasons, we conclude that the NCUA's current interpretation of § 109 is contrary to the unambiguously expressed intent of Congress and is thus impermissible under the first step of *Chevron*.[10] The judgment of the Court of Appeals is therefore affirmed.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

In determining that respondents have standing under the zone-of-interests test to challenge the National Credit Union Administration's (NCUA's) interpretation of the "common bond" provision of the Federal Credit Union Act (FCUA), 12 U. S. C. § 1759, the Court applies the test in a manner that is contrary to our decisions and, more importantly, that all but eviscerates the zone-of-interests requirement. In my view, under a proper conception of the inquiry, "the interest sought to be protected by" respondents in this action is not "arguably within the zone of interests to be protected" by the common bond provision. *Association of Data Processing Service Organizations, Inc.* v. *Camp,* 397 U. S. 150, 153 (1970). Accordingly, I respectfully dissent.

I

Respondents brought this suit under § 10(a) of the Administrative Procedure Act (APA), 5 U. S. C. § 702. To establish their standing to sue here, respondents must demonstrate

---

[10] We have no need to consider § 109's legislative history, which, as both courts below found, is extremely "murky" and a "slender reed on which to place reliance." 90 F. 3d, at 530 (internal quotation marks and citation omitted).

that they are "adversely affected or aggrieved by agency action within the meaning of a relevant statute." *Ibid.;* see *Air Courier Conference* v. *Postal Workers,* 498 U. S. 517, 523 (1991); *Lujan* v. *National Wildlife Federation,* 497 U. S. 871, 882–883 (1990). The two aspects of that requirement correspond to the familiar concepts in standing doctrine of "injury in fact" under Article III of the Constitution and "zone of interests" under our prudential standing principles. See, *e. g., Bennett* v. *Spear,* 520 U. S. 154, 162 (1997).

First, respondents must show that they are "adversely affected or aggrieved," *i. e.,* have suffered injury in fact. *Air Courier, supra,* at 523; *National Wildlife Federation, supra,* at 883. In addition, respondents must establish that the injury they assert is "within the meaning of a relevant statute," *i. e.,* satisfies the zone-of-interests test. *Air Courier, supra,* at 523; *National Wildlife Federation, supra,* at 883, 886. Specifically, "the plaintiff must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*), falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *National Wildlife Federation, supra,* at 883; see also *Air Courier, supra,* at 523–524.

The "injury respondents complain of," as the Court explains, is that the NCUA's interpretation of the common bond provision "allows persons who might otherwise be their customers to be . . . customers" of petitioner AT&T Family Federal Credit Union. *Ante,* at 488, n. 4. Put another way, the injury is a loss of respondents' customer base to a competing entity, or more generally, an injury to respondents' commercial interest as a competitor. The relevant question under the zone-of-interests test, then, is whether injury to respondents' commercial interest as a competitor "falls within the zone of interests sought to be protected by the [common bond] provision." *E. g., Air Courier, supra,* at 523–524. For instance, in *Data Processing,* where the plaintiffs—like respondents here—alleged competitive injury to

their commercial interest, we found that the plaintiffs had standing because "their commercial interest was sought to be protected by the . . . provision which they alleged had been violated." *Bennett, supra,* at 176 (discussing *Data Processing*).

The Court adopts a quite different approach to the zone-of-interests test today, eschewing any assessment of whether the common bond provision was intended to protect respondents' commercial interest. The Court begins by observing that the terms of the common bond provision—"[f]ederal credit union membership shall be limited to groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district," 12 U. S. C. § 1759—expressly limit membership in federal credit unions to persons belonging to certain "groups." Then, citing other statutory provisions that bar federal credit unions from serving nonmembers, see §§ 1757(5)–(6), the Court reasons that one interest sought to be protected by the common bond provision "is an interest in limiting the markets that federal credit unions can serve." *Ante,* at 493. The Court concludes its analysis by observing simply that respondents, "[a]s competitors of federal credit unions, . . . certainly *have* [that] interest . . . , and the NCUA's interpretation has affected that interest." *Ante,* at 493–494 (emphasis added).

Under the Court's approach, every litigant who establishes injury in fact under Article III will automatically satisfy the zone-of-interests requirement, rendering the zone-of-interests test ineffectual. See *Air Courier, supra,* at 524 ("mistak[e]" to "conflat[e] the zone-of-interests test with injury in fact"). That result stems from the Court's articulation of the relevant "interest." In stating that the common bond provision protects an "interest in limiting the markets that federal credit unions can serve," *ante,* at 493, the Court presumably uses the term "markets" in the sense of *customer* markets, as opposed to, for instance, product markets:

The common bond requirement and the provisions prohibiting credit unions from serving nonmembers combine to limit the customers a credit union can serve, not the services a credit union can offer.

With that understanding, the Court's conclusion that respondents "have" an interest in "limiting the [customer] markets that federal credit unions can serve" means little more than that respondents "have" an interest in enforcing the statute. The common bond requirement limits a credit union's membership, and hence its customer base, to certain groups, 12 U. S. C. § 1759, and in the Court's view, it is enough to establish standing that respondents "have" an interest in limiting the customers a credit union can serve. The Court's additional observation that respondents' interest has been "affected" by the NCUA's interpretation adds little to the analysis; agency interpretation of a statutory restriction will of course affect a party who has an interest in the restriction. Indeed, a party presumably will bring suit to vindicate an interest only if the interest has been affected by the challenged action. The crux of the Court's zone-of-interests inquiry, then, is simply that the plaintiff must "have" an interest in enforcing the pertinent statute.

A party, however, will invariably have an interest in enforcing a statute when he can establish injury in fact caused by an alleged violation of that statute. An example we used in *National Wildlife Federation* illustrates the point. There, we hypothesized a situation involving "the failure of an agency to comply with a statutory provision requiring 'on the record' hearings." 497 U. S., at 883. That circumstance "would assuredly have an adverse effect upon the company that has the contract to record and transcribe the agency's proceedings," and so the company would establish injury in fact. *Ibid.* But the company would not satisfy the zone-of-interests test, because "the provision was obviously enacted to protect the interests of the parties to the proceedings and not those of the reporters." *Ibid.*; see *Air Courier*,

498 U. S., at 524. Under the Court's approach today, however, the reporting company would have standing under the zone-of-interests test: Because the company is injured by the failure to comply with the requirement of on-the-record hearings, the company would certainly "have" an interest in enforcing the statute.

Our decision in *Air Courier*, likewise, cannot be squared with the Court's analysis in this action. *Air Courier* involved a challenge by postal employees to a decision of the Postal Service suspending its statutory monopoly over certain international mailing services. The postal employees alleged a violation of the Private Express Statutes (PES)—the provisions that codify the Service's postal monopoly—citing as their injury in fact that competition from private mailing companies adversely affected their employment opportunities. 498 U. S., at 524. We concluded that the postal employees did not have standing under the zone-of-interests test, because "the PES were not designed to protect postal employment or further postal job opportunities." *Id.*, at 528. As with the example from *National Wildlife Federation*, though, the postal employees would have established standing under the Court's analysis in this action: The employees surely "had" an interest in enforcing the statutory monopoly, given that suspension of the monopoly caused injury to their employment opportunities.

In short, requiring simply that a litigant "have" an interest in enforcing the relevant statute amounts to hardly any test at all. That is why our decisions have required instead that a party "establish that the *injury he complains* of . . . falls within the 'zone of interests' sought to be protected by the statutory provision" in question. *National Wildlife Federation, supra*, at 883 (emphasis added); see *Bennett*, 520 U. S., at 176. In *Air Courier*, for instance, after noting that the asserted injury in fact was "an adverse effect on employment opportunities of postal workers," we characterized "[t]he question before us" as "whether the adverse effect on the

employment opportunities of postal workers . . . is within the zone of interests encompassed by the PES." 498 U. S., at 524; see also *National Wildlife Federation, supra,* at 885–886 (noting that asserted injury is to the plaintiffs' interests in "recreational use and aesthetic enjoyment," and finding those particular interests "are among the *sorts* of interests [the] statutes were specifically designed to protect").

Our decision last Term in *Bennett* v. *Spear* is in the same vein. There, the Fish and Wildlife Service, in an effort to preserve a particular species of fish, issued a biological opinion that had the effect of requiring the maintenance of minimum water levels in certain reservoirs. A group of ranchers and irrigation districts brought suit asserting a "competing interest in the water," alleging, in part, injury to their commercial interest in using the reservoirs for irrigation water. 520 U. S., at 160. The plaintiffs charged that the Service had violated a provision of the Endangered Species Act requiring "use [of] the best scientific and commercial data available." *Id.,* at 176. We did not ask simply whether the plaintiffs "had" an interest in holding the Service to the "best data" requirement. Instead, we assessed whether the injury asserted by the plaintiffs fell within the zone of interests protected by the "best data" provision, and concluded that the economic interests of parties adversely affected by erroneous biological opinions are within the zone of interests protected by that statute. *Id.,* at 176–177 (observing that one purpose of the "best data" provision "is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives").

The same approach should lead the Court to ask in this action whether respondents' injury to their commercial interest as competitors falls within the zone of interests protected by the common bond provision. Respondents recognize that such an inquiry is mandated by our decisions. They argue that "the competitive interests of banks *were*

among Congress's concerns when it enacted the Federal Credit Union Act," and that the common bond provision was motivated by "[c]ongressional concerns that chartering credit unions could inflict an unwanted competitive injury on the commercial banking industry." Brief for Respondents 24–25. The Court instead asks simply whether respondents have an interest in enforcing the common bond provision, an approach tantamount to abolishing the zone-of-interests requirement altogether.

## II

Contrary to the Court's suggestion, *ante*, at 494–495, its application of the zone-of-interests test in this action is not in concert with the approach we followed in a series of cases in which the plaintiffs, like respondents here, alleged that agency interpretation of a statute caused competitive injury to their commercial interests. In each of those cases, we focused, as in *Bennett*, *Air Courier*, and *National Wildlife Federation*, on whether competitive injury to the plaintiff's commercial interest fell within the zone of interests protected by the relevant statute.

The earliest of the competitor standing decisions was *Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U. S. 150 (1970), in which we first formulated the zone-of-interests requirement. There, an association of data processors challenged a decision of the Comptroller of the Currency allowing national banks to provide data processing services. The data processors alleged violation of, among other statutes, § 4 of the Bank Service Corporation Act, 76 Stat. 1132, which provided that "[n]o bank service corporation may engage in any activity other than the performance of bank services." 397 U. S., at 154–155. We articulated the applicable test as "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Id.*, at 153.

In answering that question, we assessed whether the injury asserted by the plaintiffs was to an interest arguably within the zone of interests protected by the relevant statute. The data processors, like respondents here, asserted "economic injury" from the "competition by national banks in the business of providing data processing services." *Id.,* at 152, 154. We concluded that the data processors' "commercial interest was sought to be protected by the anti-competition limitation contained in § 4," *Bennett, supra,* at 176 (discussing *Data Processing*), explaining that the provision "arguably brings a competitor within the zone of interests protected by it," 397 U. S., at 156.

Our decision in *Data Processing* was soon followed by another case involving § 4 of the Bank Service Corporation Act, *Arnold Tours, Inc.* v. *Camp,* 400 U. S. 45 (1970) *(per curiam).* *Arnold Tours* was similar to *Data Processing,* except that the plaintiffs were a group of travel agents challenging an analogous ruling of the Comptroller authorizing national banks to provide travel services. The travel agents, like the data processors, alleged injury to their commercial interest as competitors. 400 U. S., at 45. Not surprisingly, we ruled that the travel agents had established standing, on the ground that Congress did not "desir[e] to protect data processors alone from competition" through § 4. *Id.,* at 46. Unlike in this action, then, our decisions in *Arnold Tours* and *Data Processing* turned on the conclusion that economic injury to competitors fell within the zone of interests protected by the relevant statute.

We decided *Investment Company Institute* v. *Camp,* 401 U. S. 617 (1971) *(ICI),* later in the same Term as *Arnold Tours.* The case involved a challenge by an association of investment companies to a regulation issued by the Comptroller that authorized national banks to operate mutual funds. The investment companies alleged that the regulation violated provisions of the Glass-Steagall Act, 1933, 48 Stat. 162, barring national banks from entering the business

of investment banking. We found that the investment companies had standing, but did not rest that determination simply on the notion that the companies had an interest in enforcing the prohibition against banks entering the investment business. Instead, we observed that, as in *Data Processing*, "Congress had arguably legislated against . . . competition" through the Glass-Steagall Act. 401 U. S., at 620–621.

The final decision in this series was *Clarke* v. *Securities Industry Assn.*, 479 U. S. 388 (1987). That case involved provisions of the McFadden Act, 44 Stat. 1228, allowing a national bank to establish branch offices only in its home State, and then only to the extent that banks of the home State were permitted to have branches under state law. The statute defined a "branch" office essentially as one that offered core banking services. The Comptroller allowed two banks to establish discount brokerage offices at locations outside the allowable branching area, on the rationale that brokerage services did not constitute core banking services and that the offices therefore were not "branch" offices. Representatives of the securities industry challenged the Comptroller's action, alleging a violation of the statutory branching limitations.

We held that the plaintiffs had standing under the zone-of-interests test, but again, not simply on the ground that they had an interest in enforcing the branching limits. Instead, we found that, as in *ICI*, Congress had "arguably legislated against . . . competition" through those provisions. 479 U. S., at 403 (internal quotation marks omitted). Specifically, Congress demonstrated "a concern to keep national banks from gaining a monopoly control over credit and money through unlimited branching." *Ibid.*; see also *id.*, at 410 (STEVENS, J., concurring in part and concurring in judgment) ("The general policy against branching was based in part on a concern about the national banks' potential for becoming massive financial institutions that would establish

monopolies on financial services"). The Court makes no analogous finding in this action that Congress, through the common bond provision, sought to prevent credit unions from gaining "monopoly control" over the customers of banking services.

It is true, as the Court emphasizes repeatedly, see *ante*, at 488–492, 494–498, that we did not require in this line of decisions that the statute at issue was designed to benefit the particular party bringing suit. See *Clarke, supra,* at 399–400. In *Arnold Tours* and *Data Processing,* for instance, it was sufficient that Congress desired to protect the interests of competitors generally through §4 of the Bank Service Corporation Act, even if Congress did not have in mind the particular interests of travel agents or data processors. See *Arnold Tours, supra,* at 46. In *Clarke,* likewise, the anti-branching provisions of the McFadden Act may have been intended primarily to protect state banks, and not the securities industry, from competitive injury. Respondents thus need not establish that the common bond provision was enacted specifically to benefit commercial banks, any more than they must show that the provision was intended to benefit Lexington State Bank, Piedmont State Bank, or any of the particular banks that filed this suit.

In each of the competitor standing cases, though, we found that Congress had enacted an "anticompetition limitation," see *Bennett,* 520 U. S., at 176 (discussing *Data Processing*), or, alternatively, that Congress had "legislated against . . . competition," see *Clarke, supra,* at 403; *ICI, supra,* at 620–621, and accordingly, that the plaintiff-competitor's "commercial interest was sought to be protected by the anticompetition limitation" at issue, *Bennett, supra,* at 176. We determined, in other words, that "the injury [the plaintiff] complain[ed] of . . . [fell] within the zone of interests sought to be protected by the [relevant] statutory provision." *National Wildlife Federation,* 497 U. S., at 883. The Court fails to undertake that analysis here.

## III

Applying the proper zone-of-interests inquiry to this action, I would find that competitive injury to respondents' commercial interests does not arguably fall within the zone of interests sought to be protected by the common bond provision. The terms of the statute do not suggest a concern with protecting the business interests of competitors. The common bond provision limits "[f]ederal credit union membership . . . to groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district." 12 U. S. C. § 1759. And the provision is framed as an exception to the preceding clause, which confers membership on "incorporators and such other persons and incorporated and unincorporated organizations . . . as may be elected . . . and as such shall each, subscribe to at least one share of its stock and pay the initial installment thereon and a uniform entrance fee." *Ibid.* The language suggests that the common bond requirement is an internal organizational principle concerned primarily with defining membership in a way that secures a financially sound organization. There is no indication in the text of the provision or in the surrounding language that the membership limitation was even arguably designed to protect the commercial interests of competitors.

Nor is there any nontextual indication to that effect. Significantly, the operation of the common bond provision is much different from the statutes at issue in *Clarke, ICI,* and *Data Processing.* Those statutes evinced a congressional intent to legislate against competition, *e. g., Clarke, supra,* at 403, because they imposed direct restrictions on banks generally, specifically barring their entry into certain markets. In *Data Processing* and *ICI,* "the question was what activities banks could engage in at all," and in *Clarke,* "the question [was] what activities banks [could] engage in without regard to the limitations imposed by state branching law." 479 U. S., at 403.

The operation of the common bond provision does not likewise denote a congressional desire to legislate against competition. First, the common bond requirement does not purport to restrict credit unions from becoming large, nationwide organizations, as might be expected if the provision embodied a congressional concern with the competitive consequences of credit union growth. See Brief for Petitioner NCUA 25–26 (Navy Federal Credit Union has 1.6 million members; American Airlines Federal Credit Union has 157,000 members); see also S. Rep. No. 555, 73d Cong., 2d Sess., 2 (1934) (citing "employees of the United States Government" as a "specific group with a common bond of occupation or association").

More tellingly, although the common bond provision applies to all credit unions, the restriction operates against credit unions individually: The common bond requirement speaks only to whether a *particular* credit union's membership can include a given group of customers, not to whether credit unions *in general* can serve that group. Even if a group of would-be customers does not share the requisite bond with a particular credit union, nothing in the common bond provision prevents that same group from joining a different credit union that is within the same "neighborhood, community, or rural district" or with whose members the group shares an adequate "occupation[al] or association[al]" connection. 12 U. S. C. § 1759. Also, the group could conceivably form its own credit union. In this sense, the common bond requirement does not limit credit union's collectively from serving any customers, nor does it bar any customers from being served by credit unions.

In *Data Processing, ICI,* and *Clarke,* by contrast, the statutes operated against national banks generally, prohibiting all banks from competing in a particular market: Banks in general were barred from providing a specific type of service (*Data Processing* and *ICI*), or from providing services at a particular location *(Clarke).* Thus, whereas in *Data Proc-*

*essing* customers could not obtain data processing services from *any* national bank, and in *Clarke* customers outside of the permissible branching area likewise could not obtain financial services from *any* national bank, in this action customers who lack an adequate bond with the members of a particular credit union can still receive financial services from a *different* credit union. Unlike the statutes in *Data Processing, ICI,* and *Clarke,* then, the common bond provision does not erect a competitive boundary excluding credit unions from any identifiable market.

The circumstances surrounding the enactment of the FCUA also indicate that Congress did not intend to legislate against competition through the common bond provision. As the Court explains, *ante,* at 493, n. 6, the FCUA was enacted in the shadow of the Great Depression; Congress thought that the ability of credit unions to "come through the depression without failures, when banks have failed so notably, is a tribute to the worth of cooperative credit and indicates clearly the great potential value of rapid national credit union extension." S. Rep. No. 555, at 3–4. Credit unions were believed to enable the general public, which had been largely ignored by banks, to obtain credit at reasonable rates. See *id.,* at 2–3; *First Nat'l Bank & Trust Co.* v. *National Credit Union Administration,* 988 F. 2d 1272, 1274 (CADC), cert. denied, 510 U. S. 907 (1993). The common bond requirement "was seen as the cement that united credit union members in a cooperative venture, and was, therefore, thought important to credit unions' continued success." 988 F. 2d, at 1276. "Congress assumed implicitly that a common bond amongst members would ensure both that those making lending decisions would know more about applicants and that borrowers would be more reluctant to default." *Ibid.*; see *ante,* at 493, n. 6; A. Burger & T. Dacin, Field of Membership: An Evolving Concept 7–8 (2d ed. 1992).

The requirement of a common bond was thus meant to ensure that each credit union remains a cooperative institu-

tion that is economically stable and responsive to its members' needs. See 988 F. 2d, at 1276. As a principle of internal governance designed to secure the viability of individual credit unions in the interests of the membership, the common bond provision was in no way designed to impose a restriction on all credit unions in the interests of institutions that might one day become competitors. "Indeed, the very notion seems anomalous, because Congress' general purpose was to encourage the proliferation of credit unions, which were expected to provide service to those would-be customers that banks disdained." *Id.*, at 1275; see also *Branch Bank & Trust Co.* v. *National Credit Union Administration Bd.*, 786 F. 2d 621, 625–626 (CA4 1986), cert. denied, 479 U. S. 1063 (1987).

That the common bond requirement would later come to be viewed by competitors as a useful tool for curbing a credit union's membership should not affect the zone-of-interests inquiry. The pertinent question under the zone-of-interests test is whether Congress *intended* to protect certain interests through a particular provision, not whether, irrespective of congressional intent, a provision may have the *effect* of protecting those interests. See *Clarke*, 479 U. S., at 394 (the "matter [is] basically one of interpreting congressional intent"); *id.*, at 400; 988 F. 2d, at 1276 ("To be sure, as time passed—as credit unions flourished and competition among consumer lending institutions intensified—bankers began to see the common bond requirement as a desirable limitation on credit union expansion. . . . But that fact, assuming it is true, hardly serves to illuminate the intent of the Congress that first enacted the common bond requirement in 1934"). Otherwise, competitors could bring suits challenging the interpretation of a host of provisions in the FCUA that might have the unintended effect of furthering their competitive interest, such as restrictions on the loans credit unions can make or on the sums credit unions can borrow. See 12 U. S. C. §§ 1757(5), (6).

In this light, I read our decisions as establishing that there must at least be *some* indication in the statute, beyond the mere fact that its enforcement has the effect of incidentally benefiting the plaintiff, from which one can draw an inference that the plaintiff's injury arguably falls within the zone of interests sought to be protected by that statute. The provisions we construed in *Clarke, ICI,* and *Data Processing* allowed such an inference: Where Congress legislates against competition, one can properly infer that the statute is at least arguably intended to protect competitors from injury to their commercial interest, even if that is not the statute's principal objective. See *Bennett,* 520 U. S., at 176–177 (indicating that zone-of-interests test is satisfied if one of several statutory objectives corresponds with the interest sought to be protected by the plaintiff). Accordingly, "[t]here [was] sound reason to infer" in those cases "that Congress intended [the] class [of plaintiffs] to be relied upon to challenge agency disregard of the law." *Clarke, supra,* at 403 (internal quotation marks omitted).

The same cannot be said of respondents in this action, because neither the terms of the common bond provision, nor the way in which the provision operates, nor the circumstances surrounding its enactment, evince a congressional desire to legislate against competition. This, then, is an action where "the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." 479 U. S., at 399. The zone-of-interests test "seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives," *id.,* at 397, n. 12, and one can readily envision circumstances in which the interests of competitors, who have the incentive to suppress credit union expansion in all circumstances, would be at odds with the statute's general aim of supporting the growth of credit unions that are cohesive and hence financially stable.

The Court's attempt to distinguish *Air Courier, ante,* at 498–499, is instructive in this regard. The Court observes that here, unlike in *Air Courier,* the plaintiffs suffer "competitive and direct injury." 498 U. S., at 528, n. 5. But the lack of competitive injury was pertinent in *Air Courier* because the statutes alleged to have been violated—the PES—were "competition statutes that regulate the conduct of competitors." *Ibid.* The common bond provision, for all the noted reasons, is not a competition law, and so the mere presence of "competitive and direct injury" should not establish standing. See *Hardin* v. *Kentucky Util. Co.,* 390 U. S. 1, 5–6 (1968). Thus, while in *Air Courier* "the statute in question regulated competition [but] the interests of the plaintiff employees had nothing to do with competition," *ante,* at 499, here, the common bond provision does *not* regulate competition but the interests of the plaintiff have *everything* to do with competition. In either case, the plaintiff's injury is at best "marginally related" to the interests sought to be protected by the statute, *Clarke, supra,* at 399, and the most that can be said is that the provision has the incidental effect of benefiting the plaintiffs. That was not enough to establish standing in *Air Courier,* and it should not suffice here.

## IV

Prudential standing principles "are 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Bennett, supra,* at 162 (quoting *Warth* v. *Seldin,* 422 U. S. 490, 498 (1975)). The zone-of-interests test is an integral part of the prudential standing inquiry, and we ought to apply the test in a way that gives it content. The analysis the Court undertakes today, in my view, leaves the zone-of-interests requirement a hollow one. As with the example in *National Wildlife Federation,* where the reporting company suffered injury from the alleged statutory violation, but the injury to the company's commercial interest was not within the zone of interests protected by

the statute, here, too, respondents suffer injury from the NCUA's interpretation of the common bond requirement, but the injury to their commercial interest is not within the zone of interests protected by the provision. Applying the zone-of-interests inquiry as it has been articulated in our decisions, I conclude that respondents have failed to establish standing. I would therefore vacate the judgment of the Court of Appeals and remand the action with instructions that it be dismissed.