MARYLAND STATE CONFERENCE OF NAACP BRANCHES, et al.

v.

MARYLAND DEPARTMENT OF STATE POLICE, et al.

No. CIV. CCB–98–1098.

United States District Court, D. Maryland.

Sept. 30, 1999.

---

Taylor, Jr., Eric A. Cook, Jawad Abdullah, Nelson D. Walker, Mecca Agunabo, plaintiffs.

Deborah A. Jeon, American Civil Liberties Union, Centreville, MD, Barbara Musfeldt Tapscott, Law Office, Jonathan Philip Guy, Swidler Berlin Shereff Friedman, LLP, Washington, DC, Dwight H. Sullivan, ACLU of Maryland, Baltimore, MD, William J. Mertens, Swidler Berlin Shereff Friedman, LLP, Washington, DC, Reginald T. Shuford, New York, NY, for George Daughtry.

Deborah A. Jeon, American Civil Liberties Union, Centreville, MD, Jonathan Philip Guy, Swidler Berlin Shereff Friedman, LLP, Washington, DC, Dwight H. Sullivan, ACLU of Maryland, Baltimore, MD, William J. Mertens, Swidler Berlin Shereff Friedman, LLP, Washington, DC, Reginald T. Shuford, New York, NY, for Verna A. Bailey.

Maureen Mullen Dove, J. Joseph Curran, Jr., Steven Marshall Sullivan, Office of the Atty. Gen., Baltimore, MD, Mark Holdsworth Bowen, Asst. Atty. Gen., Pikesville, MD, for Department of Maryland State Police, David B. Mitchell, Jesse Graybill, George H. Hall, Vernon Betkey, Keven L. Gray, John E. Appleby, George P. Brantly, Bernard M. Donovan, Steven W. Dulski, Melvin Fialkewicz, John R. Greene, Steven L. Hohner, Clifford T. Hughes, David B. Hughes, Michael T. Hughes, Steven O. Jones, James E. Nolan, Paul J. Quill, Christopher Tideberg, Ernest S. Tullis, Michael D. Wann, Billy White, John L. Wilhelm, Defendants.

### MEMORANDUM

BLAKE, District Judge.

On April 10, 1998, plaintiffs Maryland State Conference of NAACP Branches and several named individuals filed a class action lawsuit against the Maryland State Police, Col. David Mitchell, and several supervisory and individual members of the Maryland State Police ("MSP") alleging constitutional and statutory violations in

Reginald T. Shuford, Law Office, New York, NY, for Maryland State Conference, NAACP Branches, Gary D. Rodwell, Johnston E. Williams, James E. Alston, Jr., Yancey Taylor, Aleshia Taylor, George W.

connection with an alleged pattern of racially discriminatory stops, detentions and searches of minority motorists traveling on I–95 in the state of Maryland. After an initial stay was lifted in June 1998, an amended complaint was filed and preliminary discovery began, which was consolidated with discovery in the related case of *Wilkins v. Maryland State Police*, Civil Case No. CCB–93–468.

On August 14, 1998, the defendants filed a motion to dismiss or for summary judgment. In October, the plaintiffs filed a four-count second amended complaint and an opposition to the motion to dismiss.[1] In December, the defendants filed a reply[2] and a motion to strike portions of the second amended complaint. Briefing was completed in January 1999, and the parties have continued to engage in discovery, primarily directed at the issue of class certification. No hearing is necessary to resolve the pending motions.

### I. *Eleventh Amendment Immunity*

■ As both parties recognize, claims for monetary relief against state officials in their official capacity are barred by the Eleventh Amendment; claims for prospective injunctive relief are not. The plaintiffs have clarified that they seek monetary damages against state officials in their individual capacities only. Accordingly, there is no Eleventh Amendment bar to Counts II–IV.[3]

### II. *Standing*

■ For a plaintiff to have Article III standing, three "irreducible minimum" requirements must be met: 1) the plaintiff must have suffered or be at imminent risk of suffering an injury (the "injury" requirement); 2) the injury must be fairly traceable to the defendant's conduct (the "causation" requirement); and 3) a favorable federal court decision must be reasonably capable of redressing the injury (the redressability requirement). In addition to these minimum requirements, there are prudential limitations on standing that may preclude the assertion of generalized grievances or the rights of third parties. *See Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

The defendants assert that the individual plaintiffs lack standing to seek injunctive relief, relying on *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), and *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). They contend that the plaintiffs cannot show a "real and immediate" rather than "conjectural" or "hypothetical" threat of injury. *Lyons*, 103 S.Ct. at 1665.

■ *Lyons*, however, is distinguishable from this case. Not only do the plaintiffs allege a pattern and practice of racially discriminatory stops, but also the Court has found, in the *Wilkins* case, that for a period of time prior to April 1997 the plaintiffs "clearly have made a reasonable showing that there was a pattern and practice of stops by the Maryland State Police based upon race" on a portion of I–95.[4] The *Lyons* complaint, on the other hand, did not assert that there was a pattern and practice of applying chokeholds without provocation or, if it did state such a claim,

1. The second amended complaint dropped the conspiracy count which had been challenged in the motion to dismiss and added various factual allegations and seven additional plaintiffs.

2. The defendants' motion for permission to exceed the page limitation on their reply will be granted.

3. The defendants reserved the right to argue that the Eleventh Amendment bars suit against the State under Title VI. In a case involving the same abrogation clause, the Fourth Circuit recently has upheld application of the Americans with Disabilities Act to state defendants. *Amos v. Maryland Dep't. of Public Safety and Correctional Services*, 178 F.3d 212 (4th Cir.1999).

4. *Wilkins*, CCB–93–468; Order of April 22, 1997.

the Court found it was not supported by the record. *Lyons,* 103 S.Ct. at 1667, n. 7. Moreover, in *Lyons,* the likelihood that the plaintiff would again be subjected to a chokehold depended on his having "an encounter with the police [in which] either he would illegally resist arrest or detention or the officers would disobey their instructions and again render him unconscious without any provocation." *Lyons,* 103 S.Ct. at 1667. *Cf. Simmons v. Poe,* 47 F.3d 1370 (4th Cir.1995) (finding plaintiff lacked standing to challenge race based rape profile where circumstances supporting probable cause for arrest, even without profile, were so individualized as to be unlikely to occur again).

Here, the plaintiffs' likelihood of injury depends only on their status as a member of a minority group and their need to travel on I–95. Any "illegal" action on their part associated with the future stop need be no more than a minor, perhaps unintentional, traffic infraction; indeed, according to their allegations, they may be stopped even if no traffic violation has been committed. The plaintiffs also have reason to expect they will continue to travel on I–95. This combination of alleged past injury, an earlier pattern and practice finding, and the plaintiffs' likely future travel is sufficient to confer standing. *See Suhre v. Haywood County,* 131 F.3d 1083, 1090–91 (4th Cir.1997). Moreover, there is a likelihood that some members of the NAACP will be subject to stops on I–95, thereby satisfying the organizational standing requirement. *See Wiley v. City of Baltimore,* 48 F.3d 773, 775–76 (4th Cir.1995).

### III. *Supervisory Liability*

■ Supervisory state officials may not be held liable for the unconstitutional actions of individual employees on the basis of respondeat superior; they may, however, be liable where their own conduct amounts to deliberate indifference or tacit

authorization of their subordinates' activity. *Slakan v. Porter,* 737 F.2d 368, 372–73 (4th Cir.1984). As explained by the Fourth Circuit, a plaintiff must prove the following three elements:

(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994).

■ The plaintiffs have alleged in the second amended complaint, supplemented by information obtained in the *Wilkins* case, a sufficient basis to support a claim for supervisory liability. MSP officials were on notice not only through statistics but also through internal memoranda and through the course of the *Wilkins* case of the need to take corrective action. Whether the actions taken were adequate to absolve these officials of liability under § 1983 is not appropriate for determination on the present record.[5]

■ Further, as to supervisory liability, the plaintiffs allege that the discretion given to troopers to detain motorists until a drug-detecting dog can "sniff" the vehicle, in the absence of articulable suspicion, is a matter of official policy that violates the Fourth Amendment. While defendants certainly may dispute this, if the plaintiffs are correct they have stated a basis for supervisory liability that requires further development.[6]

---

**5.** Similarly, the claims against the individually-named troopers should not be dismissed while a decision on class certification is pend-

ing, and while the plaintiffs have not had adequate time for discovery.

**6.** While a dog scan of the exterior perimeter of a car in a public place is not a search, any

### V. *Qualified Immunity*

■ Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). As the Fourth Circuit has explained:

> although the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest. *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Pritchett v. Alford,* 973 F.2d 307, 314 (4th Cir.1992).

*Wilson v. Layne,* 141 F.3d 111, 114 (4th Cir.1998) (*en banc*). "In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Gould v. Davis,* 165 F.3d 265, 269 (4th Cir.1998), *quoting Pritchett,* 973 F.2d at 312. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034.

■ It is clearly established, according to both plaintiffs and defendants, that stopping, detaining, or searching motorists on the basis of race violates the Constitution. Whether it would have been clear to an individual trooper at the appropriate level of particularity that his conduct violated the Constitution depends on the resolution of disputed facts or at least on the further development of those facts, in the course of discovery. The same is true as to the issue of supervisory liability. Mere adoption of a non-discriminatory pol-icy that is not adequately implemented and enforced cannot be said to satisfy the Constitution. Whether the supervisory defendants' response to the apparent discriminatory practices of some individual troopers was constitutionally adequate remains to be determined at the close of discovery, or after trial.

Defendants misinterpret the significance of the statistical showing in this case. While it is not dispositive on the issue of discrimination, it is relevant evidence that minority motorists were treated differently from whites, at least for a period of time on a portion of I–95. In regard to qualified immunity, the plaintiffs do not suggest there was a clearly established right to have "balanced" statistics (*see* Def'ts. Reply at 36); rather, the "unbalanced" statistics were notice to supervisors of an apparent violation of the clearly established right not to be stopped, detained or searched on the basis of race.

### VI.

In Count I, the plaintiffs allege that the MSP, which received federal financial assistance from the Department of Justice, has violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

They also contend that the MSP has violated federal regulations promulgated under Title VI which provide that no program receiving financial assistance through the Department of Justice shall

> utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or

---

period of detention while waiting for a dog to be available must be reasonable. *See U.S. v.* *Place,* 462 U.S. 696, 707–09, 103 S.Ct. 2637, 77 L.Ed.2d 110(1983).

have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin.

28 C.F.R. § 42.104(b)(2).

■ Title VI implies a private right of action under the statute for victims of intentional discrimination. *See Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 112 S.Ct. 1028, 1035, 117 L.Ed.2d 208 (1992)("a clear majority [in *Guardians Ass'n v. City of New York,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983)] expressed the view that damages were available under Title VI in an action seeking remedies for an intentional violation"); *Cannon v. University of Chicago,* 441 U.S. 677, 702–03, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). The plaintiffs state detailed allegations of intentional discrimination in their second amended complaint. On the record associated with this early round of motions, granting summary judgment would be premature.

■ Whether a private right of action exists under the Title VI regulation prohibiting disparate-impact discrimination is less well settled. The United States requested and received permission to file an amicus brief in this case supporting the recognition of such a right. Upon review, I agree with the district court in *Sandoval v. Hagan,* 7 F.Supp.2d 1234 (M.D.Ala.1998)(holding that a private right of action is available to enforce the disparate impact regulation), based on the persuasive reasoning stated by the Third Circuit in *Chester Residents Concerned for Quality Living v. Seif,* 132 F.3d 925 (3d Cir.1997), judgment vacated as moot, ––– U.S. –––, 119 S.Ct. 22, 141 L.Ed.2d 783 (Aug. 17, 1998). I note also that another district court in this Circuit has approved (in dictum) the test used by the Third Circuit for determining when a private right of action to enforce a federal regulation properly may be implied. *See CSX Transportation Inc. v. PKV Limited Partnership,* 906 F.Supp. 339, 343, n. 2 (S.D.W.Va.1995); *citing Angelastro v. Prudential–Bache Sec., Inc.,* 764 F.2d 939, 947 (3d Cir.1985). The *Seif* court in turn relied on this test.

■ Like the court in *Sandoval,* I also find that the plaintiffs satisfy the prudential standing requirements for a suit under Title VI. *See also Bryant v. New Jersey Dep't of Transp.,* 998 F.Supp. 438, 443–46 (D.N.J.1998). The two goals of Title .VI are to avoid the use of federal resources to support discriminatory practices and to provide individual citizens effective protection against those practices. *See Cannon,* 99 S.Ct. at 1961. Thus, the interests to be protected by the statute are those of persons against whom federally funded programs discriminate. *See Bryant,* 998 F.Supp. at 445. Since the I–95 plaintiffs are asserting that federal funding is being used to stop minority motorists in a discriminatory fashion, these plaintiffs fall within the "zone of interests" sought to be protected by Title VI. In *National Credit Union Admin. v. First Nat'l Bank and Trust Co.,* 522 U.S. 479, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998), the Supreme Court explicitly rejected the "intended beneficiary" test, at least for claims brought under the APA, instead holding that a plaintiff has standing if the plaintiff is "arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Id.* at 933, 118 S.Ct. 927 (*quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)). The Court stated: "Although our prior cases have not stated a clear rule for determining when a plaintiff's interest is 'arguably within the zone of interests' to be protected by a statute, they nonetheless establish that we should not inquire whether there has been a congressional intent to benefit the would-be plaintiff." *National Credit Union,* 118 S.Ct. at 933. Accordingly, in the absence of any controlling Fourth Circuit or Supreme Court precedent to the

contrary, the defendants' motion to dismiss Count I will be denied.[7]

## VII. *Right to Travel*

In Count IV, the plaintiffs claim a violation of the federal guarantee of interstate travel. According to the Supreme Court's recent decision in *Saenz v. Roe*, 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999), the right to travel "embraces at least three different components." *Id.* at 1525. According to the Court, the right to travel:

> protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

*Id.* The Court then analyzed the plaintiffs' claim under each of these three components. *Id.* at 1525–28.[8]

Neither the second nor the third components cited in *Saenz* are implicated in this case. Unlike *Saenz*, the defendants here are not treating "new" residents differently from "old" residents and, therefore, the third component has no relevance to this case. As for the second component, while the plaintiffs do make an allegation in the second amended complaint that the out-of-state license plates of some of the plaintiffs "made harassment more likely," this is insufficient to support a right to travel claim. The essence of the plaintiffs' complaint remains that they, both Maryland residents and non-residents alike, have experienced the same unlawful treatment by the defendants based on race. Accordingly, the defendants are not discriminating

on the basis of residency, and the second *Saenz* component is not implicated.

Thus, the real issue in addressing the plaintiffs' right to travel claim is whether their right to enter and leave the State of Maryland is being abridged. *See id.* Since this component was not at issue in *Saenz*, the Court did not give extensive guidance as to what actions it encompassed. Cases prior to *Saenz*, however, spoke in terms of "actual barriers" to interstate movement. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 113 S.Ct. 753, 763, 122 L.Ed.2d 34 (1993); *Zobel v. Williams*, 457 U.S. 55, 102 S.Ct. 2309, 2313 n. 6, 72 L.Ed.2d 672 (1982). Here, the plaintiffs assert that they continue to travel along I–95 and, therefore, do not face an "actual barrier" to interstate travel.

Furthermore, the two cases cited by *Saenz* in discussing the first component of the right to travel both involved a greater restriction on the right to travel then the I–95 plaintiffs face. The first case cited in *Saenz*, *Edwards v. California*, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941), involved a Texas law making it a misdemeanor to bring an indigent person into the state. *Id.* at 165–66. The other case cited by the *Saenz* Court in describing this first component was *United States v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). *Guest* involved a conspiracy by whites to deprive African-American citizens of full and equal use of the public streets and highways in the vicinity of Athens, Georgia. *Id.* at 1172–73. While the first component as stated in *Saenz* may be broader then the "actual barrier" language of *Bray* and *Zobel*, and may encompass some actions which are less egregious than those in *Edwards* and

---

7. Compensatory damages, however, are not available for a disparate-impact regulatory violation. *See Guardians*, 463 U.S. at 602–03, 103 S.Ct. 3221.

8. *Saenz* was a case brought by recent California residents challenging the constitutionality of a California statute imposing durational

residency requirements for the state's benefits program. 119 S.Ct. at 1521–22. Focusing on the third component of the right to travel, the Supreme Court held that the residency requirement was unconstitutional. *Id.* at 1525–28.

*Guest,* in order to establish a constitutional violation, more of an impediment to travel is needed than the stops alleged by the I–95 plaintiffs.[9] Accordingly, the defendants' motion will be granted as to Count IV.

### VIII. *Statute of Limitations*

Several of the individual plaintiffs assert claims based on alleged unlawful stops that occurred more than three years before suit was filed. They acknowledge that a three-year statute of limitations applies to claims under § 1983 but argue that earlier claims are timely under a continuing violation theory. This argument is not persuasive.

■ Each of the plaintiffs was involved in discrete incidents on different dates involving different factual circumstances. As to plaintiffs Abdullah, Daughtry, and Davis, there is no "present" violation alleged within the limitations period and therefore the continuing violation theory cannot apply. *See Tinsley v. First Union Nat'l. Bank,* 155 F.3d 435, 442 (4th Cir. 1998); *National Advertising Co. v. City of Raleigh,* 947 F.2d 1158, 1166–67 (4th Cir. 1991); *Redding v. Anne Arundel,* 996 F.Supp. 488, 490–91 (D.Md.1998). Accordingly, the defendants' motion will be granted as to those plaintiffs whose claim is based on a stop, detention or search that occurred prior to April 10, 1995.

### IX. *Motion to Strike*

■ Many of the allegations in the second amended complaint appear to have been added in response to deficiencies in the earlier complaint asserted by defendants in their motion to dismiss. The allegations represent only one side's version of events and presumably will be disputed vigorously by the defendants. Moreover, inclusion of an event (such as settlement of a lawsuit) in the complaint does not determine whether evidence of that event will be admissible or legally significant.

Taking the time to determine whether any particular sentence or paragraph has "no possible relation to the controversy", *see* 5A Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 1382 (2d ed.1990), is not warranted. The motion will be denied.

A separate Order follows.

### ORDER

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. the defendants' motion for permission to exceed limitation on length is **Granted;**

2. the defendants' motion to strike portions of plaintiffs' second amended complaint is **Denied;**

3. the defendants' motion to dismiss or for summary judgment is **Granted** as to Count IV (Interstate Travel), and **Granted** as to individual plaintiffs Jawad Abdullah, George Daughtry, and Yvonne Davis; and otherwise **Denied;** and

4. the Clerk shall mail a copy of this Order and the accompanying Memorandum to counsel of record.

---

**9.** The Court in *Bray* also explained that restriction of movement occurring only intrastate does not implicate the right of interstate travel unless applied discriminatorily against travelers from other states. 113 S.Ct. at 763.