Justice LEE, opinion of the Court:
" 1 In mid-November 2008, the Utah Highway Patrol (UHP) performed a drug interdiction exercise on a rural stretch of I-80 in Summit County. Most of the cars stopped during the exercise, including one driven by Alan L. Chettero, were licensed in other states. Chettero's traffic stop yielded evidence of illegal drugs (105 pounds of marijuana), which Chettero sought to suppress during his subsequent prosecution for possession with intent to distribute. Chettero filed two suppression motions-one based on the Equal Protection Clause and right to travel, and the other rooted in the Fourth Amendment. The district court denied both. *584 Chettero then entered a conditional guilty plea. He now appeals.
12 We affirm. The traffic stop Chettero complains of did not restrict his movement in a manner implicating his fundamental right to travel. His equal protection claim is equally meritless: There was a rational basis for UHP's choice to focus the bulk of its enforcement efforts on cars bearing out-of-state license plates given UHP's understanding that significant quantities of drugs would be transported from California through Utah during mid-November. Finally, to the extent the district court erred in failing to consider any evidence of relevance to the Fourth Amendment motion to suppress, it is excusable as harmless error.
I
13 UHP's interdiction exercise took place November 14-16, 2008. The exercise was designed to "prevent accidents, while removing criminals, drug proceeds, and controlled substances from [Utah] highways." Its timing was prompted by California law enforcement communications, which indicated that the marijuana harvest in California ended in late October and that marijuana would likely be ready for transport eastward in mid-November. UHP hoped to intercept some of this illegal traffic. To do so, it made high-volume traffic stops on a stretch of I-80 in eastern Summit County between Kimball Junction and the Wyoming border.
T4 Most vehicles stopped were licensed outside Utah. According to Summit County dispatch tapes, 147 vehicles were stopped during the exercise, and all but one (99.3 percent) bore out-of-state plates. The troopers daily logs show slightly different numbers. These logs reveal that of the 144 stops made, 136 (95 percent) involved out-of-state plates. Despite these statistics, the state maintains that troopers were not instructed to target out-of-state vehicles.
5 In one of the twenty-three stops Trooper Jensen made during the exercise-all of which involved cars with out-of-state plates-he stopped Alan Chettero's California-plated vehicle.[1] Jensen asserts that he stopped Chettero because he crossed the fog line three times in a one-half-mile stretch. Upon approaching Chettero's car after making the stop, Jensen noticed that the rear compartment of the vehicle was completely filled with something covered by a blanket. As Jensen spoke with Chettero through the open front window, he noticed a strong odor of raw marijuana. Jensen then searched the vehicle, finding 105 pounds of marijuana.
16 Chettero was arrested and charged with possession of marijuana with intent to distribute. He filed two motions to suppress the evidence seized during the stop and/or to dismiss the information filed against him.
17 In the first motion, he argued that UHP's selective enforcement of the traffic laws had impermissibly infringed on his right to travel and violated his equal protection rights. The court held oral argument on the motion, and then denied it in a written order. In the order, the court concluded that Chettero had failed to prove that the traffic laws had been selectively enforced against him, noting that a selective enforcement claim requires proof of both discriminatory effect and discriminatory purpose. The court found Chettero had shown the former but not the latter, indicating that he had failed to show an "improper motivation" underlying the stops.
{8 After the case had been transferred to a different judge, Chettero filed an additional motion to suppress. This motion-based on the Fourth Amendment-elaimed that Trooper Jensen had fabricated the basis for the traffic stop. The district court held oral argument on the motion, and the State advanced two main pieces of evidence to prove there was an adequate basis for the stop-testimony by Trooper Jensen and a videotape showing the actual traffic stop (but not the offense precipitating it).
T9 Trooper Jensen testified at the hearing that Chettero was stopped as part of an interdiction exercise. Chettero's counsel asked him whether the "primary goal" of the *585 exercise was to "interdict marijuana for out-of-state plate vehicles." Jensen responded, "Inlo." Chettero's counsel then asked him what the purpose of the exercise was, to which Jensen responded, "[mlake high volume traffic stops." Chettero's counsel queried, "[hligh volume of out-of-state traffic stops?" Jensen answered, "[nJot specifically out of state.".
{10 Following this exchange, Chettero's counsel tried to impeach Jensen's testimony with statistical evidence showing that mostly out-of-state plated vehicles had been stopped. The district judge sustained a relevance objection to the admission of this evidence. Chettero's counsel challenged this ruling, indicating that he would like to submit a supplemental memorandum explaining how this evidence was relevant. The judge responded that he was "willing to let [him] have additional time ... to submit a memorandum based upon what's happened here today." Ultimately, after conferring with Chettero, counsel declined this opportunity. The court then denied the motion to suppress, basing its ruling on both the "testimony of ... officer [Jensen] and reviewing the videotape."
11 After both of his motions were denied, Chettero entered a conditional guilty plea, reserving the right to appeal the issues raised in his motions. Chettero was then sentenced to a suspended term of one to fifteen years, and was placed on probation for eighteen months. He then filed this appeal.
II
112 Chettero contends that the district court made two primary errors in denying his motions to suppress. First, in considering his equal protection/right to travel motion, Chettero asserts that the court wrongly concluded that he had not proved discriminatory enforcement of Utah's traffic laws. Second, in considering his Fourth Amendment motion, Chettero insists that the district court failed to consider relevant statistical evidence. We find both arguments unpersuasive and accordingly affirm.
A
113 Chettero's first motion to suppress was based on the claim that it was constitutionally impermissible for the highway patrol to selectively enforce the traffic laws against those driving cars bearing out-of-state license plates. Chettero supported this assertion with two related, but distinct, arguments, one based on the constitutional right to travel, and the other on the Equal Protection Clause. The district court rejected both arguments after concluding that Chettero had failed to show that the traffic laws had been selectively enforced against him at all. We affirm, albeit on slightly different grounds-that his right to travel and equal protection claims are meritless, even assuming he proved selective enforcement of the traffic laws.
1
(14 We find no basis for a conclusion that the UHP interdiction violated Chettero's constitutional right to travel. The mere assertion of disparate treatment of out-of-state vehicles is insufficient. For the constitutional right to travel to be implicated, Chettero would have to establish that such disparate treatment infringed on his fundamental constitutional rights. And that is a showing he cannot make.
115 Under U.S. Supreme Court pree-edent, the right to travel is understood to comprise three components: (1) "the right to go from one place to another," by using "highway facilities and other instrumentalities of interstate commerce," which "in-clud[es] the right to cross state borders while en route"; (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State"; and (8) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." See Saenz v. Roe, 526 U.S. 489, 500-01, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) (internal quotation marks omitted).
116 At oral argument, Chettero's counsel clarified that his claim was rooted solely in *586 the second component of the right to travel.[2] But this second component was not implicated by the traffic stop in question.
1 17 The second component of the right to travel is rooted in Article IV, Section 2 of the United States Constitution, which entitles citizens of "each State" to "all Privileges and Immunities of Citizens in the several states." See Saenz, 526 U.S. at 501, 119 S.Ct. 1518 (internal quotation marks omitted). A review of the cases cited in Saenz in support of this component of the right to travel indicates that it protects only the rights of nonresidents to exercise fundamental economic rights (e.g., obtaining employment or commercial licenses) or to seek important services (such as medical services).[3] See id. at 501-02, 119 S.Ct. 1518 (citing cases). And even in cireumstances involving one of these substantial rights, the second component of the right to travel does not foreclose all discrimination against non-residents. See id. It bars only "discrimination ... where there is no substantial reason for the discrimination beyond the mere fact that [individuals] are citizens of other States." Id. (internal quotation marks omitted).
[ 18 Chettero's right to travel claim cannot succeed under these standards. Here there is no allegation of any withholding of access to fundamental economic rights or essential services in Utah. Nor is there any indication of discrimination based on the mere fact of citizenship in another state. To the extent there was discrimination, it was based on intelligence that suggested marijuana would be transported from California (where it was grown) across Utah on its way east. So any differential treatment was not based on the "mere fact" that Chettero was a citizen of another state, and the right to travel was not implicated even assuming some form of discrimination.
2
119 Chettero's parallel claim of selective enforcement of the traffic laws in violation of the Equal Protection Clause fails on similar grounds. The charge of discrimination on the basis of driving an out-of-state vehicle misses a key point: Selective enforcement alone is insufficient to prevail on equal protection grounds, as most "targeting" is simply not prohibited by the Equal Protection Clause.
120 Classifications are regularly made in the creation and enforcement of the law. Most such classifications are permissible, and thus are subject only to minimal scrutiny under the Equal Protection Clause (Le., rational basis review). See State v. Robinson, 2011 UT 80, 122, 254 P.3d 183 (explaining that "rational basis" serutiny is applied unless a "fundamental right or suspect class [is] at issue"). Only a handful of classifications are so generally problematic (and so unlikely reasonable) that they trigger heightened serutiny. Such problematic classifications include race [4] and gender.[5]
*587 121 Chettero, however, has not alleged that the traffic laws were selectively enforced on the basis of any judicial-serutiny-heighten-ing classification. He asserts only that those driving Utah-licensed vehicles were treated differently than those driving vehicles licensed elsewhere. His equal protection claim is thus subject to mere rational basis review.
122 And his equal protection claim fails under this standard. Rational basis scrutiny requires only that a classification bear some conceivable relation to a legitimate government purpose or goal. See L.C. Canyon Partners, LLC. v. Salt Lake Cnty., 2011 UT 68, 112 n. 2, 266 P.3d 797 (explaining the wide degree of discretion afforded under rational basis review).[6] This "conceivable relation" standard does not require documentary evidence or other actual proof to sustain a classification. See F.C.C. v. Beach Comme'ns, Inc., 508 U.S. 307, 313-15, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1998) (explaining that classifications "may be based on rational speculation unsupported by evidence or empirical data" because classifications "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification"). After all, "the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that" the classification selected is a "rational way to correct it," even if it "exact[s] a needless, wasteful requirement." Williamson v. Lee Optical of Okla., 348 U.S. 483, 487-88, 75 S.Ct. 461, 99 L.Ed. 568 (1955).
123 Preventing drug trafficking across a state is at least a legitimate goal. See United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 LEd.2d 110 (1983) ("[The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit." (emphasis added) (internal quotation marks omitted)). And UHP had every reason to believe that high-volume traffic stops conducted in the middle of November would help it achieve this goal. After all, UHP had been in communication with California law enforcement authorities, and these authorities had informed UHP that because of the marijuana harvest in late October, drug trafficking from California eastward was most likely to occur during November. Moreover, it was certainly conceivable that individuals in cars bearing plates from other states were more likely to be passing through the state (as opposed to going from Point A to Point B within the state) and thus were more likely to be transporting some of these drugs. And, as noted, mere conceivability that those driving vehicles licensed outside the state were more likely to be transporting drugs is all that the Equal Protection Clause demands. We thus reject Chettero's contrary assertion that UHP needed concrete documentary proof to sustain its classification.
124 In these cireumstances, making high volume traffic stops focusing on out-of-state licensed vehicles had a conceivable relation to UHP's legitimate goal of intercepting drug traffic across the state. Chettero's equal protection claim accordingly fails as there is an ample rational basis for any discrimination engaged in by the state.
B
125 Chettero's second motion to suppress was rooted in the Fourth Amendment. In challenging the denial of this motion, Chette-ro contends that the district court erred in excluding relevant evidence at the hearing on this motion. The hearing centered on Chettero's assertion that Trooper Jensen had fabricated the basis for his traffic stop. In *588 support of that charge, Chettero sought to admit statistical evidence showing that the vast majority of cars stopped by UHP during the course of the interdiction exercise bore out-of-state license plates, claiming this statistical evidence impeached Trooper Jensen's credibility because Jensen had allegedly denied that the primary goal of the interdiction exercise was to target out-of-state individuals.
11 26 We affirm the denial of this motion to suppress. Although the district court may have misapprehended Chettero's argument, two key considerations convince us that there was either no error at all or that any error was harmless.[7]
1
T27 First, it is not at all clear that the statistical evidence Chettero advanced would have impacted Trooper Jensen's credibility, and Chettero affirmatively waived the opportunity that the district court provided him to show how it might have. After all, Trooper Jensen never indicated that there was no ongoing interdiction campaign at the time of the Chettero stop. Nor did Jensen ever deny stopping more cars from out of state (which is what the statistical evidence Chettero advanced would have shown). Rather, Jensen noted only that the purpose of the exercise was not "specifically" to stop those from out of state.
[28 In context, Jensen might reasonably have been insisting only that the subjective purpose of the exercise was to stop those likely to be carrying drugs (and not generally to stop those from out of state). And presumably that was the specific purpose of the interdiction. With this in mind, the statistical evidence Chettero sought to introduce would not obviously have contradicted Trooper Jensen's testimony or undermined his credibility.[8]
T29 And in any event, Chettero's counsel waived the express opportunity afforded by the district court to show that it did. After Trooper Jensen's testimony, and before the court ruled on Chettero's motion, the court gave him the opportunity to submit "a memorandum based upon what's happened here today." Chettero's counsel declined this opportunity after conferring with Chettero. If Chettero wished to preserve an objection to the trial court's failure to consider the relevant statistical evidence, he should have availed himself of this opportunity. Submitting the memorandum would have allowed Chettero to specifically explain just how the statistical evidence affected Trooper Jensen's credibility, based upon the testimony Jensen actually gave at the hearing. This showing was one that Chettero had not made previously,[9] and that he never made at the suppression hearing itself.
*589 1 30 Rather, at the hearing he did no more than generally assert that the statistical evidence was relevant to Trooper Jensen's credibility in the abstract, noting that "the more evidence that there is that the officer stopped these vehicles and that his mission was to search these vehicles for marijuana coming from out-of-state that goes to the officer's credibility." But this general assertion was only true to the extent that Trooper Jensen's testimony actually indicated he had some other "mission" at the time of the stop. And for the reasons already noted, it was less than clear that his testimony did so. Chette-ro's supplemental brief could have offered such a showing. His failure to do so forecloses his argument on appeal.
2
131 Further, even if the statistical evidence had clearly borne on Trooper Jensen's credibility, the district court's ruling denying Chettero's motion to suppress was not based solely on Jensen's testimony. Rather, in ruling on the motion, the district court also relied in part on the videotape of the stop.[10] And although the videotape did not show the traffic violation leading to the stop, it did show the actual stop. Apparently, moreover, the videotape corroborated portions of Trooper Jensen's testimony related to the stop, including the fact that Chettero had crossed the fog line again as he was being pulled over, straddling it for quite a distance until his vehicle came to rest at a stop sign at the bottom of the ramp.[11] It also appears to have discredited portions of Chettero's testimony, including his assertion that Trooper Jensen was a mere half-car-length away when he made the stop.
132 Significantly, though, this video was not included in the record on appeal. And "[when crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court." State v. Pritchett, 2008 UT 24, 113, 69 P.3d 1278 (internal quotation marks omitted). Thus, even if it was error to not consider the statistical evidence, Chettero still cannot show that this error was prejudicial, given that the judge also based his ruling on the video evidence, which was not included in the appellate record.[12] Consequently, we conclude that the trial court's exclusion of the statistical evidence was, at most, harmless error, and affirm the denial of his second motion to suppress.
Justice LEE authored the opinion of the Court, in which Chief Justice DURRANT and Justice PARRISH joined.
*590 Associate Chief Justice NEHRING filed an opinion concurring and dissenting in part, in which Justice DURHAM joined.

. This stop occurred at 9:30 p.m. on November 13, 2008. Although this raises the question whether Chettero was stopped during the course of the interdiction exercise (which ran from November 14-16), the State concedes that he was, and we accordingly assume that fact.

. Counsel's waiver of the first component might seem puzzling at first blush, given that Chettero sought to traverse Utah using its interstate highways and the traffic stop arguably restricted his freedom to do so. On reflection, however, the waiver of this component seems necessitated by the case law, which limits the reach of this component to cases involving significant impediments on the right to freely traverse a state-impediments beyond the mere threat of a traffic stop for a violation of the traffic laws. See, eg., Edwards v. California, 314 U.S. 160, 174, 177, 62 S.Ct. 164, 86 L.Ed. 119 (1941) (striking down a law that criminalized bringing an entire class of persons [indigents] into California); see also Maryland State Conference of NAACP Branches v. Maryland Dep't of State Police, 72 F.Supp.2d 560, 568-69 (D.Md.1999) (observing that a mere traffic stop probably does not implicate the first component of the right to travel).

. This is consistent with the U.S. Supreme Court's pronouncement that the Privileges and Immunities Clause applies only to rights that "bear[ ] on the vitality of the Nation as a single entity" and are "sufficiently basic to the livelihood of the Nation." Supreme Court of Virginia v. Friedman, 487 U.S. 59, 64, 108 S.Ct. 2260, 101 L.Ed.2d 56 (1988) (internal quotation marks omitted).

. See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 720, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007) ("[Rlacial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." (internal quotation marks omitted)).

. See United States v. Virginia, 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) ("Parties *587 who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action.").

. See also State v. Robinson, 2011 UT 30, ¶ 24, 254 P.3d 183 (explaining that classifications are sustained under rational basis review "if we can reasonably conceive of facts which would justify the distinctions" (internal quotation marks omitted)); Ry. Express Agency, Inc. v. New York, 336 U.S. 106, 110, 69 S.Ct. 463, 93 L.Ed. 533 (1949) (""It is no requirement of equal protection that all evils of the same genus be eradicated or none at all."); Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 539-40, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (explaining that the Equal Protection Clause does not require "abstract symmetry" (internal quotation marks omitted)).

. See HUF. v. W.P.W., 2009 UT 10, 144, 203 P.3d 943 ("[HJarmless error is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings." (alteration in original) (internal quotation marks omitted)).

. The dissent claims that Trooper Jensen's testimony "makes clear that the officer [was] saying under oath that the purpose of the exercise was to stop everyone, not to focus on out-of-state plates." Infra 136. But as the full hearing colloquy reveals, infra 134, Trooper Jensen never clearly manifested such a purpose. Trooper Jensen's general statement that the purpose of the exercise was to "[mlake high-volume traffic stops" simply does not indicate an answer to the more nuanced question of which individuals would be targeted in making those stops. And when asked that more nuanced question specifically, Trooper Jensen never denied that he may have stopped more individuals driving vehicles licensed outside of Utah. Rather, he merely denied that doing so was the "specific ]" purpose of the interdiction exercise.

. Chettero raised a related argument in his earlier memorandum in support of the motion to suppress. This memorandum had referenced State v. Lopez, 873 P.2d 1127 (Utah 1994), in asserting that evidence indicating that a police detention is motivated by suspicions unrelated to the traffic offense makes an officer's assertion that the offense occurred less credible. But this general argument was not the same as the specific one that the trial judge gave Chettero the opportunity to make, and certainly is not a basis to determine that he did not waive expounding on his theory regarding Trooper Jensen's testimony. Until the suppression hearing, after all, Chettero did not know what Trooper Jensen would say about the purpose underlying the traffic stop. The dissent fails to grasp this point in suggesting that the initial memorandum was sufficient. Infra §37. This memorandum did not (and could not) give the trial court the opportunity to rule on the specific argument that the statements made by Trooper Jensen at the suppression hearing were actually contradicted by the statistics. And it was this specific issue that the *589 supplemental memorandum would have allowed Chettero to raise. An initial memorandum that, by the dissent's admission, "speaks in generalities," cannot be said to have specifically preserved this more nuanced argument. Infra 137.

. In particular, the court noted that "based upon what I have heard here, based upon the testimony of the officer and reviewing the videotape, I believe that there's probable cause to stop." (Emphasis added.)

. Trooper Jensen's testimony had indicated his observation that "as the vehicle was taking the offramp, [Chettero] crossed the fog line again and straddled the fog line with the vehicle until coming to a stop at a stop sign," and that this was something that caused him "further concern" as the "vehicle came to a stop."

. The dissent finds fault with this analysis based on its suggestion that there was "nothing critical about the video" because it did not show the Chettero traffic infraction and was accordingly "not relevant to the question of whether the officer had reasonable suspicion to seize Mr. Chettero when he activated his lights and initiated the stop." Infra 138. But while it is true that the video does not show the Chettero infraction-a point already made clear above, supra T31-the video is nonetheless significant. This significance follows from the fact, acknowledged by the dissent, that Chettero's suppression motion was, "like most suppression motions, ... a credibility contest." Infra 134. The video evidence bore on the issue of credibility by, apparently, both corroborating Trooper Jensen's account of the stop and discrediting portions of Chettero's account. Supra 131. But because this video evidence was not included in the appellate record, Chettero cannot bear his burden of showing that the exclusion of the statistical evidence he sought to introduce-which also bore on credibility-was prejudicial error warranting reversal. After all, the videotape could have been sufficient to independently convince the trial court that, in this "credibility contest," Jensen was telling the truth and Chettero was not. And in the absence of its inclusion in the appellate record, we have no choice but to presume that it supports the trial court's conclusion that Trooper Jensen was the winner of the "credibility contest," infre 134, such that the trial court's ultimate denial of suppression was proper.