United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 10, 1999 Decided December 3, 1999 

 No. 98-5495

 Roberto Saavedra Bruno, et al., 
 Appellants

 v.

 Madeleine K. Albright, Secretary of State, et al., 
 Appellees

 Appeal from the United States District Court 
 for the District of Columbia 
 (98cv00252)

 Jonathan P. Graham argued the cause for appellants. With 
him on the briefs was Max Stier.

 Meredith Manning, Assistant U.S. Attorney, argued the 
cause for appellees. With her on the brief were Wilma A. 
Lewis, U.S. Attorney, R. Craig Lawrence, Assistant U.S. 
Attorney, David W. Ogden, Acting Assistant Attorney Gener-

al, U.S. Department of Justice, and Alison Marie Igoe, 
Attorney.

 Before: Sentelle, Randolph, and Rogers, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Randolph.

 Randolph, Circuit Judge: This is an appeal from the 
judgment of the district court dismissing an action for judicial 
review of the decision of the American Consulate in Panama 
refusing to issue a visa to Roberto Saavedra Bruno, and the 
decision of the American Consulate in La Paz, Bolivia, revok-
ing another visa Saavedra held. Both consular decisions 
rested on information, not revealed to Saavedra, that he had 
engaged in illicit drug trafficking. Saavedra unequivocally 
denies the charge and complains that he has never had an 
opportunity to confront and counter the evidence relied upon 
by the consular officers. He insists that the Administrative 
Procedure Act, and the grant of jurisdiction over cases aris-
ing under federal law, entitles him to put the government to 
its proof.

 I

 Saavedra is a Bolivian national. He moved to Washington, 
D.C. with his family in 1993. At the time, he held an F-1 visa 
(student) and a B-1/B-2 visa (temporary visitor for business 
or pleasure) set to expire in May 2002. Shortly after settling 
in Washington, Saavedra and his family moved again, to Coral 
Gables, Florida. There he formed a corporation--Musicanga, 
Inc.--for the purpose of recording and promoting Latin 
American music. Saucedo Wichtendahl, a United States citi-
zen, was hired as the company's artistic director and interim 
manager.

 In May 1995, Saavedra's company filed a petition for a 
nonimmigrant worker with the INS, seeking to have Saave-
dra classified as a managerial employee qualified for an L-1 
visa. The INS approved the classification for a one-year 
period, until May 17, 1996. A month before this was to 
expire, the company filed a petition to extend the classifica-
tion for another year, which the INS granted. Saavedra then 

traveled abroad to seek the renewal of his visa, as is required, 
presenting himself to the American consul in Panama City on 
May 16, 1996. See 8 U.S.C. s 1201(a).

 Upon finding Saavedra listed in the State Department's 
computer "lookout" system, the American consul in Panama 
City denied his visa application. Saavedra's name had been 
entered by the U.S. Consul General in Bolivia, who had 
received classified reports from federal agencies that Saave-
dra had been involved in narcotics trafficking. Saavedra 
quickly returned to the United States. He was detained 
briefly at the border but allowed to enter after an immigra-
tion hearing had been scheduled. At the hearing the follow-
ing week, the immigration officer told him to leave the 
country and to resolve the matter with the United States 
Embassy in Bolivia. He therefore departed on June 11, 1996. 
In the meantime, Saavedra's lawyer provided information to 
the Consul General in Bolivia, trying to persuade her of his 
client's eligibility for a visa. The Consul General reviewed 
this information along with the classified reports and made a 
formal determination that Saavedra was ineligible to be ad-
mitted to the United States under s 212 of the Immigration 
and Nationality Act ("INA"), 8 U.S.C. s 1182(a)(2)(C), be-
cause there was reason to believe that he had been an illicit 
trafficker of controlled substances, or had knowingly assisted 
and abetted, or conspired and colluded with, others in the 
illicit trafficking of controlled substances. The Consul Gener-
al sent a letter to Saavedra at his Florida address revoking 
his B-1/B-2 visa.

 Thereafter, the State Department issued an advisory opin-
ion supporting the Consul General's finding that Saavedra 
was ineligible for a visa under s 212(a)(2)(C) of the INA. 
The State Department issued a Certificate of Revocation on 
August 1, 1996, providing that the revocation of the B-1/B-2 
visa would be effective as of Saavedra's next departure from 
the United States. Saavedra wrote to the Consul General 
requesting her and the Department of State to recommend 
that the Attorney General grant him a waiver pursuant to 8 
U.S.C. s 1182(d)(3), which would allow Saavedra to return 
temporarily to the United States. No action was taken on 

the waiver request until April 1998 when the State Depart-
ment notified Saavedra that it had been denied.

 In January 1998, Saavedra, his company, and its officer, 
Wichtendahl, filed suit in the district court seeking review 
under the Administrative Procedure Act ("APA"), 5 U.S.C. 
s 701 et seq., of the revocation of his B-1/B-2 visa and the 
refusal to renew his L-1 visa. The complaint also challenged 
the State Department's failure to act on the request for a 
waiver of inadmissibility under s 212(d)(3) of the INA, 8 
U.S.C. s 1182(d)(3). The district court dismissed the com-
plaint, finding that the doctrine of consular nonreviewability 
barred the first two claims and that the third claim was moot. 
Bruno v. Albright, 20 F. Supp. 2d 51 (D.D.C. 1998).

 II

 The main question is whether, under the Administrative 
Procedure Act, an alien is entitled to judicial review of a 
consul's denial of his application for a visa, and of the 
revocation of a visa he already held. To put the question in 
perspective, we must begin with some history.

 A

 After a century of unimpeded alien migration to the United 
States, Congress in 1875 established grounds upon which 
aliens might be refused entry, and, seven years later, enacted 
the first general immigration statute. See Act of Mar. 3, 
1875, ch. 141, 18 Stat. 477 (barring prostitutes and convicts); 
Act of Aug. 3, 1882, ch. 376, 22 Stat. 214. Further legislation 
soon followed, including a general revision of the immigration 
laws in 1903, enlarging the classes of aliens ineligible for 
entry, and another general revision in 1917. See Act of Mar. 
3, 1903, ch. 1012, 32 Stat. 1213; Act of Feb. 5, 1917, ch. 29, 39 
Stat. 874. In the same year, 1917, the Departments of State 
and Labor issued a Joint Order to Diplomatic, Consular and 
Immigration Officers requiring for the first time that aliens 
coming to the United States have visas issued by an Ameri-
can consulate. See generally 3 Green Haywood Hackworth, 
Digest of International Law 741 (1942); Leon Wildes, Re-
view of Visa Denials: The American Consul as 20th Century 
Absolute Monarch, 26 San Diego L. Rev. 887, 892 (1989). In 

the next year, while the country was at war, the President 
designated the Secretary of State as the official in charge of 
granting permission to aliens to enter. See 3 Hackworth, 
supra, at 741. In implementing this system, American con-
suls in foreign countries simply advised aliens of the various 
exclusionary provisions of the immigration laws, leaving the 
determination of excludability to immigration officers at the 
port of entry. See Wildes, supra, at 892. This resulted in 
large numbers of foreigners making the arduous trip to the 
United States only to be detained at the border and then 
excluded. See 3 Hackworth, supra, at 741-42. To cure this 
problem, Congress passed the Act of 1924 (ch. 190, 43 Stat. 
153), transferring the responsibility for determining the ad-
missibility of aliens from the Secretary of State to consular 
officers. See 3 Hackworth, supra, at 742.

 The Immigration and Nationality Act of 1952, 8 U.S.C. 
s 1101 et seq., now governs visa processing. The INA con-
fers upon consular officers exclusive authority to review 
applications for visas, precluding even the Secretary of State 
from controlling their determinations. See 8 U.S.C. 
ss 1104(a), 1201(a). The powers afforded to consular officers 
include, in particular, the granting, denying and revoking of 
immigrant and non-immigrant visas. See 8 U.S.C. s 1201(a), 
(i). Consular officers exercise this authority subject to the 
eligibility requirements in the statute and corresponding reg-
ulations. 22 C.F.R. ss 41.121-.122.

 Obtaining a visa from an American consul has never guar-
anteed an alien's entry into the United States. A visa merely 
gives the alien permission to arrive at a port of entry and 
have an immigration officer independently examine the alien's 
eligibility for admission. See 8 U.S.C. s 1201(h). See gener-
ally James A.R. Nafziger, Review of Visa Denials by Consu-
lar Officers, 66 Wash. L. Rev. 1, 14 (1991). It is the immigra-
tion officer's responsibility to make certain that the alien does 
not fall within any of the statutory categories barring admis-
sion. Among the categories are past criminal behavior. See 
8 U.S.C. s 1182. Since 1952, the law has specifically excluded 
aliens engaged in the illicit drug trade. See 5 Charles 

Gordon et al., Immigration Law and Procedure s 63.03[1][a] 
(1997).

 The following provision, barring drug traffickers, led the 
consular officer to determine that Saavedra was ineligible for 
a visa: "any alien who the consular or immigration officer 
knows or has reason to believe is or has been an illicit 
trafficker in any such controlled substance or is or has been a 
knowing assister, abettor, conspirator, or colluder with oth-
ers" in the illicit trafficking in drugs is ineligible for entry. 8 
U.S.C. s 1182 (a)(2)(C). In order to exclude an alien on this 
basis, the consular officer "must have more than a mere 
suspicion--there must exist a probability, supported by evi-
dence, that the alien is or has been engaged in trafficking." 9 
U.S. Department of State, Foreign Affairs Manual s 40.23 
(1999). Consular officers possessing such evidence enter the 
alien's name in the worldwide visa lookout system as "P2C", 
possible narcotics trafficker. When visa denials are based on 
an applicant's listing in the lookout system, the consular 
officer informs the applicant that the denial rested on a 
finding of ineligibility, but the officer is not required to 
disclose the existence or details of the INS lookout entry. 
See id.

 B

 Saavedra's argument against the district court's dismissal 
of his action proceeds as follows: under the Administrative 
Procedure Act, judicial review of agency action is the norm, 
preclusion of review the exception; consular discretion in 
determining whether to deny or revoke a visa is not unbound-
ed; Congress has not expressly barred judicial review of visa 
decisions; no statute strips the federal courts of jurisdiction 
over such cases; and this court's decision in Abourezk v. 
Reagan, 785 F.2d 1043, 1049-52 (D.C. Cir. 1986), stands for 
the proposition that consular visa determinations are subject 
to judicial scrutiny.

 Saavedra's general description of the APA is quite correct. 
Numerous opinions, of the Supreme Court and of the lower 
federal courts, speak in terms of the APA's "presumption" of 

judicial review of agency action. See, e.g., Lincoln v. Vigil, 
508 U.S. 182, 190 (1993); Abbott Lab. v. Gardner, 387 U.S. 
136, 140 (1967); Dixie Fuel Co. v. Commissioner of Social 
Security, 171 F.3d 1052, 1057 (6th Cir. 1999); Ball, Ball & 
Brosamer, Inc. v. Reich, 24 F.3d 1147, 1450 (D.C. Cir. 1994). 
The presumption is said to derive from APA s 702: a "person 
suffering legal wrong because of agency action, or adversely 
affected or aggrieved by agency action ... is entitled to 
judicial review thereof," 5 U.S.C. s 702. There are two 
notable qualifications. The validity of agency action may not 
be tested in court if "statutes preclude judicial review" or if 
"agency action is committed to agency discretion by law." 5 
U.S.C. s 701(a)(1)-(2).

 Sometimes it is suggested that s 701(a)(1) and (2) are the 
only exceptions to review under s 702. See Bennett v. Spear, 
520 U.S. 154, 175 (1997); Florida Power & Light Co. v. EPA, 
145 F.3d 1414, 1420 (D.C. Cir. 1998); Comsat Corp. v. FCC, 
114 F.3d 223, 226 (D.C. Cir. 1997). The suggestion is, we 
think, not entirely accurate. As revised in 1976, s 702 itself 
contains another qualifying clause. It provides that "Nothing 
herein"--which includes the portion of s 702 from which the 
presumption of reviewability is derived--"affects other limita-
tions on judicial review or the power or duty of the court to 
dismiss any action or deny relief on any other appropriate 
legal or equitable ground," 5 U.S.C. s 702(1). The House 
Report accompanying this amendment described these "other 
limitations" as including "express or implied preclusion of 
judicial review." H.R. Rep. No. 94-1656, at 12 (1976).1 The 

__________
 1 For the most part, the Department of Justice supported the 
amendment of APA s 702, the main purpose of which was to 
eliminate the defense of sovereign immunity of the United States in 
actions in federal court seeking relief other than money damages. 
Then-Assistant Attorney General Antonin Scalia told the Senate 
subcommittee that "one of the very premises of the proposal" was 
that actions seeking judicial review could still be disposed of on 
grounds such as "lack of standing; lack of ripeness; availability of 
an alternative remedy in another court; express or implied statuto-
ry preclusion of judicial review; commission of the matter by law to 
agency discretion; privileged nature of the defendant's conduct; 

Administrative Conference of the United States, which had 
proposed the specific language enacted as s 702(1), explained 
that the courts would still refuse "to decide issues about 
foreign affairs, military policy and other subjects inappropri-
ate for judicial action." 1 Recommendations and Reports of 
the Administrative Conference 191, 225. On the same sub-
ject, the Administrative Conference pointed out that "much of 
the law of unreviewability consists of marking out areas in 
which legislative action or traditional practice indicate that 
courts are unqualified or that issues are inappropriate for 
judicial determination." Id.

 Whether analyzed in terms of s 702(1), or in terms of 
s 701(a)(1), the conclusion is the same--the district court 
rightly held that it could not entertain Saavedra's lawsuit. 
The overriding consideration is the nature of consular visa 
decisions.2 To the history just discussed, more must be 
added.

 In prescribing the conditions for allowing aliens to enter 
the country, Congress acted in accordance with the ancient 
principle of international law that a nation state has the 
inherent right to exclude or admit foreigners and to prescribe 
applicable terms and conditions.3 This firmly-established 
__________
failure to exhaust administrative remedies; discretionary power to 
refuse equitable relief; and the 'political question' doctrine." H.R. 
Rep. No. 94-1656, supra, Exh. C, at 26-27.

 2 Our discussion in this part applies both to the revocation of 
Saavedra's B-1/B-2 visa and the denial of his L-1 visa. Consular 
officers have complete discretion over issuance and revocation of 
visas. See 8 U.S.C. ss 1104(a), 1201(i). The INA provides, "After 
the issuance of a visa or other documentation to any alien, the 
consular officer or the Secretary of State may at any time, in his 
discretion, revoke such visa or documentation." 8 U.S.C. s 1201(i); 
see also 22 C.F.R. s 41.122. The same eligibility criteria apply 
whether the consular officer refuses to renew a visa or decides to 
revoke a previously issued one. See 8 U.S.C. s 1182(a)(2)(C). In 
Saavedra's case, once the Consul General in La Paz received 
information rendering him ineligible for an L-1 visa, that same 
information resulted in the revocation of his B-1/B-2 visa.

 3 See, e.g., Ekiu v. United States, 142 U.S. 651, 659 (1892); 
Harisiades v. Shaughnessy, 342 U.S. 580, 596 (1952) (Justice 

principle, dating from Roman times,4 received recognition 
during the Constitutional Convention5 and has continued to 
be an important postulate in the foreign relations of this 
country and other members of the international community.6 
For more than a century, the Supreme Court has thus 
recognized the power to exclude aliens as " 'inherent in 
sovereignty, necessary for maintaining normal international 
relations and defending the country against foreign encroach-
ments and dangers--a power to be exercised exclusively by 
the political branches of government' "7 and not "granted 

__________
Frankfurter, concurring); C. BouvE, Exclusion and Expulsion of 
Aliens, 4 & n.3 (1912), and authorities there cited; II Emerlich de 
Vattel, Le Droit Des Gens ss 94, 100 (1758).

 4 E. Borchard, Diplomatic Protection of Citizens Abroad 33, 44-
48 (1915).

 5 See 3 Papers of James Madison 1277 (1840), in which Madison 
reports Gouverneur Morris' observation during the debates that 
"every society, from a great nation down to a club, ha[s] the right of 
declaring the conditions on which new members should be admit-
ted." Article I, Section 9, Clause 1, of the Constitution is an 
implicit recognition of Congress's authority to regulate immigration. 
In addition, Article III of the Jay Treaty of 1794, 8 Stat. 116, 117, 
provided that British and American subjects could freely cross the 
Canadian border. See Karnuth v. United States, 279 U.S. 231 
(1929). As to the Colonial understanding of the sovereign's power 
to control the admission of aliens, see Thomas Jefferson, Notes on 
the State of Virginia 83-85 (Peden ed. 1955).

 6 See, e.g., Convention Between the United States of America and 
other American Republics Regarding the Status of Aliens, art. I, 
46 Stat. 2753, 2754 (1928); Constitution of the Intergovernmental 
Committee for European Migration, 6 U.S.T 603, 604 (1955); Hines 
v. Davidowitz, 312 U.S. 52 (1941); 3 Hackworth, supra, at 725-29; 
W. Hall, International Law 211-12 (6th ed. 1909); 4 John Bassett 
Moore, International Law Digest 151-74 (1906); Borchard, supra 
note 5, at 44-48.

 7 Kleindienst v. Mandel, 408 U.S. 753, 765 (1972), quoting the 
Solicitor General's brief; see Fiallo v. Bell, 430 U.S. 787, 792 (1977) 
(quoting Shaughnessy v. Mezei, 345 U.S. 206, 210 (1953)).

away or restrained on behalf of anyone." The Chinese Exclu-
sion Case, 130 U.S. 581, 609 (1889).

 These considerations underlie the Court's long-standing 
recognition that "any policy toward aliens is vitally and 
intricately interwoven with contemporaneous policies in re-
gard to the conduct of foreign relations, the war power, and 
the maintenance of a republican form of government. Such 
matters are so exclusively entrusted to the political branches 
of government as to be largely immune from judicial inquiry 
or interference." Harisiades v. Shaughnessy, 342 U.S. 580, 
588-89 (1952); see also Reno v. American-Arab Comm., 119 
S. Ct. 936, 947 (1999). Though it may be "error to suppose 
that every case or controversy which touches foreign relations 
lies beyond judicial cognizance," Baker v. Carr, 369 U.S. 186, 
211 (1962), it is nevertheless "not within the province of any 
court, unless expressly authorized by law, to review the 
determination of the political branch of the Government to 
exclude a given alien." United States ex rel. Knauff v. 
Shaughnessy, 338 U.S. 537, 543 (1950).8

 In view of the political nature of visa determinations and of 
the lack of any statute expressly authorizing judicial review of 
consular officers' actions, courts have applied what has be-
come known as the doctrine of consular nonreviewability. 
The doctrine holds that a consular official's decision to issue 
or withhold a visa is not subject to judicial review, at least 
unless Congress says otherwise.9 For the greater part of this 

__________
 8 Justice Harlan put it this way in Lem Moon Sing v. United 
States, 158 U.S. 538, 547 (1895): "The power of Congress to exclude 
aliens altogether from the United States, or to prescribe the terms 
and conditions upon which they may come to this country, and to 
have its declared policy in that regard enforced exclusively through 
executive officers, without judicial intervention, is settled by our 
previous adjudications."

 9 Historically, disputes arising from the denial of a visa applica-
tion have been handled through diplomatic channels, not by courts. 
In United States ex rel. London v. Phelps, 22 F.2d 288 (2d Cir. 
1927), a British subject challenged the denial of a visa, which 
prevented her from traveling from Montreal to visit her children in 

century, our court has therefore refused to review visa deci-
sions of consular officials. United States ex rel. Ulrich v. 
Kellogg, 30 F.2d 984, 986 (D.C. Cir. 1929), held that the then-
current immigration law did not provide for an official review 
of a consular officer's denial of a visa. Under succeeding 
incarnations of federal immigration law through to the pres-
ent, this court and other federal courts have adhered to the 
view that consular visa determinations are not subject to 
judicial review. See, e.g., Castaneda-Gonzalez v. INS, 564 
F.2d 417, 428 n.25 (D.C. Cir. 1977); Chi Doan v. INS, 160 
F.3d 508, 509 (8th Cir. 1998); Centeno v. Shultz, 817 F.2d 
1212, 1213 (5th Cir. 1987) (per curiam); Li Hing of Hong 
Kong, Inc. v. Levin, 800 F.2d 970 (9th Cir. 1986); Rivera de 
Gomez v. Kissinger, 534 F.2d 518, 518 (2d Cir. 1976) (per 
curiam); Romero v. Consulate of the United States, Barran-
quilla, Colombia, 860 F. Supp. 319, 322-24 (E.D. Va. 1994); 
Kummer v. Schultz, 578 F. Supp. 341, 342 (N.D. Tex. 1984); 
Licea-Gomez v. Pilliod, 193 F. Supp. 577, 582 (N.D. Ill. 1960). 
In Castaneda-Gonzalez, we dealt with the subject tersely, in a 
footnote, because the law was so settled: a consular officer, 
we wrote, could refuse to issue a visa to an alien "without fear 
of reversal since visa decisions are nonreviewable." 564 F.2d 
at 428 n.25.

 In terms of APA s 702(1), the doctrine of consular nonre-
viewability--the origin of which predates passage of the 
APA--thus represents one of the "limitations on judicial 
review" unaffected by s 702's opening clause granting a right 
of review to persons suffering "legal wrong" from agency 
action.10 As the report of the Administrative Conference on 

__________
New York. The Second Circuit, holding the denial nonreviewable, 
noted that the "[u]njustifiable refusal to vise a passport may be 
ground for diplomatic complaint by the nation whose subject has 
been discriminated against [but is] beyond the jurisdiction of the 
court." See id. at 290 (citing 3 John Bassett Moore, A Digest of 
International Law 995-97 (1906)).

 10 The same result would follow if "legal wrong" in s 702 were 
interpreted, as the Attorney General's Manual suggested in 1947, to 
mean "such wrong as ... the courts have recognized as constituting 

s 702(1) put it, this is an area "in which legislative action 
[and] traditional practice indicate that courts are unqualified 
or that issues are inappropriate for judicial determination."11

 Or from the principles just discussed we may infer that, in 
the words of APA s 701(a)(1), the immigration laws "preclude 
judicial review" of the consular visa decisions. The inference 
is, we believe, unmistakable in light of the severe limitation of 
remedies afforded aliens who--unlike Saavedra--are physi-
cally present at the United States border when they are 
denied entry. Again, some history needs to be recounted.

 Until the Supreme Court's decision in Brownell v. We 
Shung, 352 U.S. 180 (1956), aliens detained by immigration 
officials at ports of entry had but one legal recourse--habeas 
corpus. See Heikkila v. Barber, 345 U.S. 229 (1953); Ekiu v. 
United States, 142 U.S. 651, 660 (1892). The right to seek 

__________
ground for judicial review." United States Department of Justice, 
Attorney General's Manual on the Administrative Procedure Act 
96 (1947). Hence, in certain areas--and visa determinations are 
one of them--judicial non-intervention is the norm and the pre-
sumption of review "runs aground." Department of the Navy v. 
Egan, 484 U.S. 518, 527 (1988); Peoples v. United States Dep't of 
Agric., 427 F.2d 561, 567 (D.C. Cir. 1969).

 11 As to s 701(a)(2)--"agency action committed to agency discre-
tion by law"--the Supreme Court has not as yet adopted Justice 
Scalia's view, expressed in his dissenting opinion in Webster v. Doe, 
486 U.S. 592, 608-10 (1988), that s 701(a)(2) was meant to incorpo-
rate the common law of judicial review "--a body of jurisprudence 
that had marked out, with more or less precision, certain issues and 
certain areas that were beyond the range of judicial review." Id. at 
608. Rather, in Webster v. Doe, id. at 599-600, as in Heckler v. 
Chaney, 470 U.S. 820 (1985), the Court interpreted s 701(a)(1) to 
preclude judicial review when statutes are written so broadly that 
"there is no law to apply" (Citizens to Preserve Overton Park, Inc. 
v. Volpe, 401 U.S. 402, 410 (1971)). In Abourezk v. Reagan, 785 
F.2d 1043, 1051 (D.C. Cir. 1986), aff'd by an equally divided Court, 
484 U.S. 1 (1987), this court held that "the Immigration Act 
emphatically did not commit the decision to exclude an alien to 
standardless agency discretion...."

habeas relief arose as a consequence of the alien's being in 
custody; it did not rest on any right to entry. In We Shung, 
the Court considered whether, in addition to habeas corpus, 
an alien could challenge an exclusion order under the APA. 
The Court held that the 1952 INA, unlike the prior Immigra-
tion Act of 1917, did not limit detained aliens to habeas 
corpus. See We Shung, 352 U.S. at 184-86. Citing the 
legislative history of the 1952 Act, the Court concluded that 
Congress had intended the APA to apply both to exclusion 
and to deportation proceedings. See id. at 186; see also H.R. 
Rep. No. 82-2096, at 127 (1952). The Court limited its ruling 
to aliens present in the United States, stating: "We do not 
suggest, of course, that an alien who has never presented 
himself at the borders of this country may avail himself of the 
declaratory judgment action by bringing the action from 
abroad." 352 U.S. at 184 n.3.

 In 1961, Congress overruled We Shung, amending the INA 
to make clear that habeas corpus was the only method for 
judicial review of exclusion orders. The House Report ex-
plained:

 For three-quarters of a century, prior to the decision in 
 the Shung case, habeas corpus was the sole and exclusive 
 method for testing in court an administrative determina-
 tion that an alien was not entitled to enter the United 
 States.... 
 
 * * *

 ... Such a restriction to habeas corpus does not deprive 
 the alien of any constitutional rights. It is well settled 
 that aliens seeking admission to the United States cannot 
 demand that their applications for entry be determined 
 in a particular manner or by use of a particular type of 
 proceedings. For those aliens, the procedure fixed by 
 Congress is deemed to be due process of law. (Knauff v. 
 Shaughnessy, 338 U.S. 537 (1950)).
 
H.R. Rep. No. 87-1086, at 31-32 (1961). Under the INA 
amendments, "any alien against whom a final order of exclu-

sion has been made heretofore or hereafter under the provi-
sions of [this Act] may obtain judicial review of such order by 
habeas corpus proceedings and not otherwise." Pub. L. No. 
87-301, s 5(b), 75 Stat. 651 (1961); 8 U.S.C. s 1105a(b).

 By restoring habeas corpus as the sole remedy, Congress 
ensured that only aliens in custody could challenge exclusion 
orders, a legislative decision implicitly precluding review to 
aliens located abroad, such as Saavedra. See H.R. Rep. No. 
87-1086, supra, at 33. The House Report pointed out that 
"habeas corpus actions are necessarily determined in the 
locality where the alien is, where he has been excluded, and 
where he is 'knocking at the door.' " Id. The amendments 
reflect Congress's sense that habeas provided "a full, com-
plete, and adequate method for judicial review of an exclusion 
order." Id. at 32-33. To allow APA review would "give 
recognition to a fallacious doctrine that an alien has a 'right' 
to enter this country which he may litigate in the courts of 
the United States against the United States as a defendant." 
Id. at 33. Moreover, the amended statute provided that "an 
order of deportation or of exclusion shall not be reviewed by a 
court if the alien has not exhausted [his] administrative 
remedies ... or if he has departed from the United States." 
Id. at 3, 28 (emphasis added).

 It is not plausible then, that in restricting review of exclu-
sion orders to habeas corpus, Congress intended to allow 
aliens residing abroad to have greater remedies than those 
detained by immigration officials at United States ports of 
entry. To put the matter in terms of APA s 701(a)(1), we 
may infer that the immigration laws preclude judicial review 
of consular visa decisions. There was no reason for Congress 
to say as much expressly. Given the historical background 
against which it has legislated over the years, including even 
the congressionally-overruled We Shung decision, 352 U.S. at 
184 n.3, Congress could safely assume that aliens residing 
abroad were barred from challenging consular visa decisions 
in federal court unless legislation specifically permitted such 
actions. The presumption, in other words, is the opposite of 
what the APA normally supposes. In this respect the case is 
similar to Department of the Navy v. Egan, 484 U.S. 518, 527 

(1988). See Peoples v. United States Dep't of Agric., 427 F.2d 
561, 567 (D.C. Cir. 1969). When it comes to matters touching 
on national security or foreign affairs--and visa determina-
tions are such matters--the presumption of review "runs 
aground." 484 U.S. at 527. This much follows from the 
Court's instruction that APA review may be foreclosed by 
virtue of "the collective import of legislative and judicial 
history behind a particular statute ... [or] by inferences of 
intent drawn from the statutory scheme as a whole." Block v. 
Community Nutrition Inst., 467 U.S. 340, 349 (1984), relied 
upon in Egan (484 U.S. at 530). It follows as well from the 
Court's recurring statements, of which United States ex rel. 
Knauff v. Shaughnessy, 338 U.S. at 543, is an example, that 
there may be no judicial review of the decisions to exclude 
aliens unless Congress has "expressly authorized" this.

 For many of the reasons just given and for another about 
to be discussed, the government maintains that federal courts 
have no jurisdiction over actions such as Saavedra's. We 
agree, of course, that in light of Califano v. Sanders, 430 U.S. 
99, 105, 107 (1977), APA s 702 cannot be considered a juris-
dictional grant and that Saavedra must therefore rest on the 
general federal question statute, 28 U.S.C. s 1331. But this 
general jurisdictional provision, the government tells us, is 
subject to preclusion-of-review legislation and the Illegal Im-
migration Reform and Immigrant Responsibility Act of 1996 
("IIRIRA"), Pub. L. No. 104-208, s 306(a)(2), 110 Stat. 3009, 
546, is such legislation. There Congress further restricted 
judicial review of exclusion orders, now called removal orders, 
in actions brought by aliens present in the United States. As 
matters now stand, federal courts have no jurisdiction "to 
review any final order of removal against an alien who is 
removable by reason of having committed [certain] criminal 
offense[s]"--including trafficking in controlled substances. 8 
U.S.C. s 1252(a)(2)(c); cf. Yang v. INS, 109 F.3d 1185, 1192 
(7th Cir. 1997). The IIRIRA also amended the immigration 
law provision giving general jurisdiction to the district courts. 
The amended provision now reads: the "district courts of the 
United States shall have jurisdiction of all causes, civil and 
criminal, brought by the United States that arise under the 

provisions of this subchapter," 8 U.S.C. s 1329, thus making 
clear that district court jurisdiction founded on the immigra-
tion statute is confined to actions brought by the government. 
See Reno v. American-Arab Comm., 119 S. Ct. at 940 n.4. 
The "provisions of this subchapter," to which s 1329 refers, 
include the provisions dealing with consular visa decisions. 
Read in light of the long history of judicial noninterference 
with the judgments of consular officers regarding visas, one 
might characterize IIRIRA s 1329 as a restriction on district 
court jurisdiction to review claims such as those set forth in 
Saavedra's complaint, a restriction superseding general feder-
al question jurisdiction. Or one might view this recent legis-
lative history as reinforcing the judgment, to which we sub-
scribe, that the immigration laws preclude judicial review of 
consular visa decisions and that the doctrine of consular 
nonreviewability remains intact, until Congress provides oth-
erwise. Both views amount to the same thing and lead to the 
same conclusion--namely, that Saavedra's claims cannot be 
heard.

 C

 All that remains of this aspect of the case is Saavedra's 
argument that our decision in Abourezk v. Reagan, 785 F.2d 
1043 (D.C. Cir. 1986), aff'd by an equally divided Court, 484 
U.S. 1 (1987), forecloses any contention that consular visa 
decisions are immune from judicial review. We think Saave-
dra reads more into the Abourezk opinion than the court 
intended.

 Each plaintiff in the three consolidated actions on appeal in 
Abourezk was an American citizen. On constitutional and 
statutory grounds, they contested the denial of visas to 
foreigners they had invited to come to the United States and 
give speeches. 785 F.2d at 1048-49. In that respect the case 
was akin to, but different from, Kleindienst v. Mandel, 408 
U.S. 753 (1972). Different because in Mandel, professors in 
this country, claiming a First Amendment right to hear a 
Belgian journalist talk in the United States, challenged not 
the consular officer's denial of the journalist's request for a 

visa, but the Attorney General's refusal to waive his ineligibil-
ity for a visa (he was a Marxist).12 See id. at 756-59. The 
Supreme Court held in Mandel that so long as the Attorney 
General gave a "facially legitimate and bona fide reason," as 
he did, the courts will not test the decision by balancing the 
justification against the supposed First Amendment interests 
of those who wished to converse with the alien face-to-face. 
Id. at 770.

 Citing Mandel, the court in Abourezk rejected the State 
Department's contention that the district court lacked subject 
matter jurisdiction. Judicial review was proper, the court 
held, when United States sponsors of a foreign individual 
claim that the State Department's denial of a visa to an alien 
violated their constitutional rights. See id. at 1050. As a 
decision of a panel, Abourezk cannot be treated as an overrul-
ing of Castaneda-Gonzalez, 564 F.2d at 428 n.25,13 and it 
cannot be read as expressing disagreement with other deci-
sions recognizing the doctrine of consular nonreviewability. 
The Abourezk court went out of its way to distinguish those 
decisions, and it did so on grounds that are against Saavedra. 
Thus, the Abourezk court did not take issue with the "long-
standing judicial practice of refusing to review [visa denial] 
claims like those raised here" at the behest of a disappointed 
alien. 785 F.2d at 1051 n.6 (citations omitted). Instead, the 
court found this judicial practice inapplicable to the cases 
before it, because they involved "claims by United States 
citizens rather than by aliens ... and statutory claims that 
are accompanied by constitutional ones." Id.14

__________
 12 The INA authorizes the Attorney General to grant a waiver of 
ineligibility upon recommendation of the Secretary of State or of 
the consular officer that the alien be admitted temporarily despite 
his inadmissibility. See 8 U.S.C. s 1182(d)(3).

 13 One panel cannot overrule another panel. See LaShawn v. 
Barry, 87 F.3d 1389 (D.C. Cir. 1996).

 14 We take note of Judge Bork's point that plaintiffs' statutory 
claims had to be reviewed in order for the court to reach their 
constitutional claims. See id. at 1062 n.1 (Bork, J., dissenting).

 Whatever one might think of these distinctions, they serve 
to undermine Saavedra's position. Unlike Abourezk, Saave-
dra's American sponsors--Musicanga, Inc. and Wichten-
dahl--asserted no constitutional claims. Furthermore, in our 
view, neither Musicanga, Inc., nor its officer Wichtendahl, 
have standing to challenge the denial or the revocation of 
Saavedra's visa. With respect to purely statutory claims, 
courts have made no distinction between aliens seeking re-
view of adverse consular decisions and the United States 
citizens sponsoring their admission; neither is entitled to 
judicial review. See Li Hing of Hong Kong, Inc., 800 F.2d at 
970. Saavedra's American sponsors are attempting to assert 
rights not afforded to them by the INA. The INA permitted 
them to file a petition with the Attorney General to have 
Saavedra classified as a managerial employee so that he 
might qualify for an L-1 visa. See 8 U.S.C. s 1154(a)(1)(D). 
When their petition was granted and Saavedra received that 
classification, their cognizable interest terminated. Because 
their interest has already been satisfied, the citizen sponsors 
have not been aggrieved "within the meaning of the relevant 
statute" and have no right of review under the APA even if 
APA review were available. National Credit Union Admin. 
v. First Nat'l Bank & Trust Co., 118 S. Ct. 927, 933 (1998); 5 
U.S.C. s 702.

 Thus, Saavedra cannot by any stretch bring himself within 
the narrow holding of Abourezk. Any doubts on this score 
are laid to rest by City of New York v. Baker, 878 F.2d 507 
(D.C. Cir. 1989), an appeal from the judgment of the district 
court rendered on remand from Abourezk. Citing 
Castaneda-Gonzalez, the court held that neither it nor the 
district court has the "power to serve as a proxy consular 
officer": "This circuit has recognized, as has every circuit to 
consider the issue, that the courts are without authority to 
displace the consular function in the issuance of visas." 878 
F.2d at 512.15

__________
 15 Given the fact that Abourezk was the "law of the case," the 
court in Baker engaged in no discussion regarding preclusion of 
judicial review. The statement we quote dealt with the question of 
remedy, but is important nonetheless in light of the court's citation, 

 In addition, Abourezk rested in large measure on the 
provision of the INA-8 U.S.C. s 1329 (1982)--then giving 
federal district courts jurisdiction over "all causes, civil and 
criminal, arising under any of the provisions" of the immigra-
tion statutes. See 785 F.2d at 1049-50. In light of s 1329, 
the Abourezk court determined that APA s 701(a)(1) did not 
apply: "the Immigration Act, far from precluding review, 
affirmatively provides for it." 785 F.2d at 1051. No such 
statement can be made today. As we have discussed (pp. 15-
16 supra), the amendment to s 1329 now makes clear that 
district courts do not have general jurisdiction over claims 
arising under the immigration laws and that their jurisdiction 
extends only to actions brought by the government.

 III

 The remaining portion of Saavedra's complaint sought an 
injunction compelling the State Department to act on Saave-
dra's request for a waiver of inadmissibility pursuant to 8 
U.S.C. s 1182(d)(3). Though the State Department has since 
denied the waiver request, Saavedra maintains that the claim 
is not moot because "voluntary cessation of challenged con-
duct" does not render the controversy ended. Brief for 
Appellants at 42, citing United States v. W.T. Grant Co., 345 
U.S. 629, 632 (1953). Saavedra now seeks a declaration that 
the government must respond in a timely fashion to waiver 
requests that he is likely to file in the future. The State 
Department's one-time delay in acting on Saavedra's request 
does not satisfy this court that such relief is necessary. 
Because Saavedra has not shown a "cognizable danger of 
recurrent violation," we decline to issue the declaration he 
requests. Madsen v. Women's Health Center, Inc., 512 U.S. 
753, 765 n.3 (1994) (citing United States v. W.T. Grant Co., 
345 U.S. at 633).

 Affirmed.

__________
with approval, to this court's opinion in Castaneda-Gonzalez and 
the opinions of other courts sustaining the doctrine of consular 
nonreviewability.